**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| PHILLIP C. ENGERS, WARREN J. MCFALL, DONALD G. NOERR & GERALD SMIT, individually and on behalf of all others similarly situated, | Civil Action No.: 98-3660 (JLL) |
| Plaintiffs, | |
| v. | OPINION[1] |
| AT&T and the AT&T MANAGEMENT PENSION PLAN, | |
| Defendants. | |

**LINARES,** District Judge.

This matter comes before the Court on the motions for partial summary judgment[2] of

Plaintiffs Phillip C. Engers, Warren J. McFall, Donald G. Noerr & Gerald Smit ("Plaintiffs") and

Defendants AT&T and the AT&T Management Pension Plan (collectively "Defendants"). The

Court has considered all submissions in support and in opposition to these motions. No oral

argument was heard. Fed. R. Civ. P. 78. For the reasons stated herein, the motion of Plaintiffs is

---

[1]Although Plaintiffs' and Defendants' Appendices filed in conjunction with the summary judgment motions were originally filed under seal, all necessary parties ultimately consented to unseal all documents. As such, this opinion will not be filed under seal.

[2]As explained herein, the Court will not consider the motions for summary judgment with respect to Claims Ten and Twelve. Thus, the Court treats the motions as partial.

denied and the motion of Defendants is denied in part and granted in part.

## BACKGROUND

**A.      Procedural Background**

Plaintiffs instituted this action in August, 1998 seeking to challenge various provisions of the AT&T Management Pension Plan ("AT&TMPP" or the "Plan"). After multiple motions to dismiss and motions for leave to amend, Plaintiffs filed their Fourth Amended Complaint (the "Complaint") on November 23, 2004. The present Complaint contains seven claims which have not been dismissed: Claims Three, Four, Five, Six, Seven, Ten and Eleven. Plaintiffs filed a motion for summary judgment in October, 2004 requesting this Court to enter judgment as a matter of law with respect to all claims currently existing in the Complaint. Defendants subsequently filed a motion for summary judgment with respect to Claims Three, Four, Five, Six and Seven and requested this Court to dismiss all claims. Notably, Defendants did not move for summary judgment on Claims Ten or Twelve nor submit opposition to this portion of Plaintiffs' motion. Defendants argue that since Counts Ten and Twelve had been previously dismissed by the Court, they were not properly pleaded and could not be raised on summary judgment. Plaintiffs however argue that since Magistrate Judge Hedges allowed an amendment of the Complaint to plead Count Ten by way of ¶88A and Count Twelve by way of ¶94A, these claims were proper for summary judgment.

The Court agrees with Defendants. Plaintiffs moved the Court for leave to amend the Complaint and add two new legal theories, proposed Claims 88A and 94A on September 14, 2004. Before such leave was granted, however, Plaintiffs filed their motion for summary

judgment on October 7, 2004 and moved on these not-yet-added claims, apparently anticipating their addition to the case. Magistrate Judge Hedges granted Plaintiffs leave to amend on November 17, 2004, a decision which Defendants appealed and this Court affirmed on September 13, 2005. However, the Court does not determine that Claims 88A and 94A were a part of the Complaint until this Court ultimately affirmed Judge Hedges' order on September 13, 2005. Thus, it was not proper for Plaintiffs to move for summary judgment on these claims before they were an actual part of the case. As such, by way of preliminary matter, the Court will deny Plaintiffs' motion with respect to Claims 88A and 94A without prejudice to be raised by way of later motion. The Court will now address the cross-motions for summary judgment with respect to the remaining claims.

**B.     Factual Background**[3]

AT&T  is a business corporation organized and existing under New York law, but is qualified to, and does business in New Jersey. (Compl. ¶ 7). The AT&TMPP is a "defined benefit plan" subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C § 1001, et seq. The Plan was established in October 1980 as a benefit plan available to AT&T management employees. AT&T is the "plan administrator" as that term is defined by ERISA. Since the Plan is a defined benefit plan, only AT&T makes contributions, not the employees. As set forth in the Plan, authority to amend the Plan lies with the AT&T Board of Directors (the "Board") or its delegate.[4]

---

[3]The Court refers only to undisputed facts unless otherwise noted.

[4]As set forth in Section 10.01 of both the 1996 and 1998 restated Plan, titled "Power to Amend," "[t]he board of directors of AT&T or its delegate, may from time to time make changes

A detailed factual background of the Plan's provisions prior to and after its transition to the cash balance formula was set forth in the Honorable William J. Bassler's, United States District Judge, Opinion of October 17, 2002 and will not be recounted here, except where necessary to provide context for the pending motions for summary judgment.

Prior to its amendment, the Plan provided for the calculation of pension benefits using a four-factor formula. The calculation was based upon: (1) the participant's years of service; (2) the participant's average compensation during a certain period; (3) the participant's annual compensation each year following the relevant period; and (4) a specific percentage multiplier. (the "old formula"). This type of formula is referred to as a "pay base averaging formula." Benefits under the Plan were paid out upon the participant reaching the normal retirement age under the Plan – sixty-five, and were paid in terms of an annual annuity. If the participant was married on the day his or her pension begun, the participant typically received a reduced pension with a survivor annuity payable to his or her eligible spouse after the participant's death.

Commencing in 1997, AT&T took steps to convert the Plan to utilize a "cash balance" formula. Unlike a traditional defined benefit plan, cash balance calculations depend upon a participant's years of participation in the Plan, the participant's salary, the number of years a participant has until reaching normal retirement age, and the interest rate. Register v. PNC Financial Services Corp., 2005 WL 3120269, *1 (E.D.Pa. 2005). The benefit in a cash balance plan is usually expressed as a lump-sum payout rather than an annuity. According to the amended

_____

in the Plan as set forth in this document, or terminate such Plan, but such changes or termination shall not affect the rights of any individual, without his or her consent, to any benefit or pension to which he or she may have previously become entitled hereunder."

AT&TMPP, each participant would be assigned a hypothetical cash balance account that would annually accrue "interest" and "pay" credits. The cash balance formula was to be effective January 1, 1998 and AT&T expected to significantly decrease its pension administration expenses following its institution.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) provides for summary judgment when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996). Alternately, summary judgment will be granted when the evidence on the record "is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. Jersey Cent. Power & Light Co. v. Lacey Township, 772 F.2d 1103, 1109 (3d Cir. 1985). The non-moving party cannot rest on mere allegations and must instead present actual evidence that establishes a genuine issue as to a material fact for trial. Anderson, 477 U.S. at 256-57; Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1130-31 (3d Cir. 1995); Sound Ship Bldg. Corp. v. Bethlehem Steel Co., 533 F.2d 96, 99 (3d Cir. 1976), cert. denied, 429 U.S. 860 (1976).

In considering a motion for summary judgment, all evidence submitted must be viewed in the light most favorable to the party opposing the motion. Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 330 (3d Cir. 1995). However, even if the facts are undisputed, "summary

judgment may not be granted ... if there is a disagreement over what inferences can be reasonably drawn from the facts." Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737, 744 (3d Cir. 1996) (quoting Nathanson v. Med. Coll. of Pa., 926 F.2d 1368, 1380 (3d Cir. 1991).

The Court's present task is to determine whether genuine issues of material fact exist and whether any party is entitled to judgment as a matter of law.

## DISCUSSION

In the Complaint, Plaintiffs claim that AT&T violated various provisions of ERISA requiring certain notice and disclosures as well as breached its fiduciary duties under ERISA by failing to have a written plan document and for failure to keep Plan beneficiaries informed. Each of these allegations will be analyzed separately within the relevant legal framework established by this Circuit.

**A.     Count Three: Improper, Untimely & Inadequate Notice**

Plaintiff moves for summary judgment on Count Three of the Fourth Amended Complaint. Count Three alleges that AT&T, as plan sponsor, did not comply with the notice requirements set forth in ERISA § 204(h), 29 U.S.C. § 1054(h). Plaintiffs contend that the cash balance conversions resulted in a "significant reduction in the rate of future accruals" "without providing notice ... at least 15 days before the amendments' effective date." (Compl. ¶¶ 58-59). Further, Plaintiffs contend that any notice to participants, if provided, was not "understandable" as ERISA requires. (Pl. Br. Summ. J. at 12).

Defendants move for summary judgment on the same claim, arguing that Plaintiffs fail to prove both that§ 204 notice was required and that Defendants's written communications with

6

participants failed to comply with the applicable statutory requirements. Thus, Defendants assert that Count Three must be dismissed with prejudice.

Section 204(h) provides[5] in relevant part that a defined benefit plan like the Plan at issue:

> may not be amended so as to provide for a <u>significant reduction in the rate of future benefit accrual</u>, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a <u>written notice</u>, setting forth the plan amendment and its effective date, to – (A) each participant in the plan ...

29 U.S.C. § 1054(h)(emphasis added). Thus, to establish a violation of § 204(h), Plaintiffs must demonstrate that Defendants were required to provide notice, that notice was untimely and that the notice was deficient.

Since this test is inclusive, a plaintiff must first establish that the amendment[6] in question provided for a significant reduction in the rate of benefit accrual. 29 U.S.C. § 1054(h)(1). If a plaintiff is unable to prove that the amendment in question would provide for such a reduction, § 204(h) would not require the provision of any notice. A court would then have no need to reach

---

[5]§ 204(h) has since been amended to require that the notice be sufficient to enable participants to understand the amendment's effect. 29 U.S.C. § 1054(h)(2), as amended by Pub.L. No. 107-16 § 659(b), effective Jan. 1, 2002.

[6]Plaintiffs assert that Defendants made more than one amendment to the Plan. Plaintiffs allege that the 4/97 Resolutions did not constitute the *only* amendment to the Plan. Plaintiffs argue that later Resolutions constituted subsequent, separate amendments, and thus, Defendants' notice is deficient since it was provided after the effective date of these purported amendments. (Pl. Br. Opp. Summ. J. at 14). The Court does not determine that this is a necessary analysis to undertake within the context of § 204(h) notice. Even if, for the sake of argument, Defendants made *several* rather than *one* amendment to the Plan, if none of these resulted in a "significant reduction in the rate of benefit accrual," no notice would be necessary. 29 U.S.C. § 1054(h)(1). Thus, it is worthwhile first to examine whether any such reduction exists before addressing the arguments of Plaintiffs relating to the provision of or sufficiency of notice with regard to these alleged post hoc amendments.

any allegation that notice was untimely or otherwise deficient. In short, there could be no claim.

The Temporary Regulations explicitly state that § 204(h) of ERISA "does not apply to an amendment that does not affect the rate of future benefit accrual." Notice of Significant Reduction in the Rate of Future Benefit Accrual, 60 Fed. Reg. 64,321 (December 15, 1995).[7] Further, the regulations clarify that "an amendment to a defined benefit plan that does not affect the <u>annual benefit commencing at normal retirement age</u> does not affect the rate of future benefit accrual for purposes of section 204(h)." (<u>Id.</u>) (emphasis added). This proposition is elaborated upon in the Questions & Answers section ("Q&A") contained at the end of the regulations. Q&A 5 states that "an amendment to a defined benefit plan affects the rate of future benefit accrual only if it is reasonably expected to change the <u>amount</u> of the future annual benefit commencing at normal retirement age." Notice of Significant Reduction in the Rate of Future Benefit Accrual, 60 Fed. Reg. 64,322 (December 15, 1995) (emphasis added).

Here, the parties do not dispute that age 65 constitutes the "normal retirement age" under the Plan. However, the parties disagree on the interpretation of § 204(h)'s language and the accompanying requirements of the regulations. Plaintiffs interpret the statute and regulations literally. Plaintiffs argue that since the cash balance formula reduced the <u>rate</u> of future benefit accruals for participants, AT&T was required to provide notice to participants 15 days in advance of the provisions' effective date. In support of this proposition, Plaintiffs offer the expert report

---

[7]The aforementioned regulation was issued by the Internal Revenue Service on December 15, 1995 as a temporary regulation governing the operation of § 204(h). By their terms, these temporary regulations governed plan amendments "adopted on or after December 15, 1995, and amendments effective by the terms on or after January 2, 1996." Notice of Significant Reduction in the Rate of Future Benefit Accrual, 60 Fed. Reg. 64,324 (Q&A-15(b)).

of actuary, Claude Poulin.[8] ("Poulin"). Plaintiffs assert that Poulin's analysis, utilizing the

Treasury Department guidelines for determining rates of accrual, demonstrates a substantial

reduction in these benefits following the implementation of cash balance which triggered the

notice requirements of § 204(h). (Pl. Br. Summ. J. at 14).

Defendants argue however that the correct analysis is one which compares the (1)

projected annual benefit at age 65 under the pre-Amendment plan and (2) such projected benefit

under the post-amendment Plan. (Def. Br. Summ. J. at 27). If this comparison does not reflect a

significant reduction in the amount of accrued benefit available under the amended Plan,

Defendants argue no notice was thus required.[9] In support, Defendants also direct the Court to the

report drafted by the Plaintiffs' expert, Poulin.[10] Exhibits C-1 through C-4 of the Affidavit of

Claude Poulin includes a "Comparison of Projected Benefits" for each named Plaintiff: Gerald J.

Smit, Phillip C. Engers, Warren J. McFall and Donald G. Noerr. (Poulin Aff.; Def. App. at 523-

---

[8]The Court notes that Defendants vehemently challenges Poulin's qualifications and determinations. However, for the purposes of this motion, the Court will address such challenges only when specifically relevant to the Court's analysis. An opinion on Defendants' pending appeal of the Magistrate Judge's opinion is forthcoming.

[9]Here, Plaintiffs argue that Defendants' arguments are merely an attempt to re-litigate standing, an issue previously decided by Judge Politan. However, even assuming that Plaintiffs have standing, they must still prove the substance of § 204(h). Judge Politan's determination that Plaintiffs "proffered sufficient evidence which tended to counter the Defendants' contention that none of the named Plaintiffs will suffer a reduction in annual benefits commencing at age sixty-five by virtue of the Plan amendment," does not indicate that such evidence is controlling or persuasive at this juncture. (Slip Op. Dated Nov. 19, 2001, 12-13).

[10]Plaintiffs challenge Defendants' reliance on a Certification prepared by Kevin Armant. (Pl. Br. Opp. Summ. J. at 10). However, the Court determines that it need not reach the merits of this particular argument. There is enough evidence in the record, including that which has been offered by the Plaintiffs' expert, Poulin, to support the Court's determinations. The Court does not need to rely upon the Armant documents to reach its conclusions with respect to Plaintiffs' § 204(h) claim.

26). These charts contain Poulin's calculated figures for each Plaintiff's "Accrued Benefit at Age 65" under the Cash Balance Formula as well as figures which reflect each Plaintiff's "Accrued Benefit at Age 65" under the "Prior Plan Formula." (Id.).

After reviewing the statutory language contained in § 204(h) and the temporary regulations in effect at all relevant times, this Court determines that Plaintiffs erroneously interpret the language of § 204(h). Although § 204(h) contains the language "rate of future benefit accrual," the accompanying regulations provide further context and specificity. (Id.) (emphasis added). As a matter of law, to determine whether § 204(h) notice is required, the Court must examine the effect of any amendments on the amount of future benefits, not the rate at which they accrue. This view may appear counter-intuitive since § 204(h) explicitly refers to "rate," but the regulations leave no question that the proper inquiry must focus on the amount of benefit, not rate.[11]

After careful review of Poulin's expert report and charts which display the benefits for each named Plaintiff, the Court determines that as a matter of law, no named Plaintiff will suffer a reduction in his accrued benefit as of age 65, as a result of the cash balance transition, let alone a significant reduction. Poulin's report concludes that participants will suffer a reduction in the rate of benefit accruals but does not demonstrate a reduction in accrued benefits. (Poulin Aff.;

---

[11]Significantly, regulations subsequently adopted in 1998 confirm this interpretation. In the regulations' introduction, it is stated that "the final regulations retain the rule of the proposed and temporary regulations that, for purposes of section 204(h), an amendment to a defined benefit plan affects the rate of future benefit accrual *only if* it is reasonably expected to change the amount of the future annual benefit commencing at normal retirement age." Notice of Significant Reduction in the Rate of Future Benefit Accrual, 60 Fed. Reg. 68,680 (December 14, 1998) (emphasis added).

Def. App. at 523-26). Rather, the actuarial analyses show each Plaintiff's post-amendment accrued benefits, as calculated by the Plaintiffs' own actuarial expert, as <u>higher</u> than the projections of accrued benefits under the pre-amendment plan. (Poulin Aff.; Def. App. at 523-26). Without demonstrating a reduction of benefits, let alone a significant reduction, Plaintiffs' claim under § 204(h) must fail. As set forth in the Temporary Regulations, § 204(h) "does not apply to an amendment that does not affect the rate of future benefit accrual." Notice of Significant Reduction in the Rate of Future Benefit Accrual, 60 Fed. Reg. 64,321 (December 15, 1995). Plaintiffs have not provided the Court with additional evidence beyond Poulin's calculations for the named Plaintiffs to prove that any Plan participant's accrued benefits as of age 65 would be lower post-amendment than they were projected pre-amendment. Plaintiffs' emphasis on participants' allegedly lower *rates* of accrual to demonstrate a § 204(h) notice violation is insufficient as a matter of law. Accordingly, for the foregoing reasons, the Court determines, as a matter of law, that Plaintiffs are unable to establish a claim under § 204(h). Plaintiffs' motion for summary judgment is denied and Defendants's motion for summary judgment is granted. Plaintiffs' § 204(h) claim against Defendants is hereby dismissed with prejudice.

**B.    Counts Four and Five: Failure to Have a Written Plan Document and Consequent Breach of Fiduciary Duty**

Plaintiffs move for summary judgment on Counts Four and Five of the Complaint. Plaintiffs' Fourth Claim asserts that AT&T failed to implement two cash balance provisions without a written document in violation of §402 of ERISA, 29 U.S.C. § 1102. The Fifth Claim alleges that AT&T's failure to have a written plan document constituted a breach of its fiduciary

duties as set forth in §404 of ERISA, 29 U.S.C. § 1104.[12] Specifically, Plaintiffs allege that two

provisions later added to the amended Plan document "(1) were not adopted by the Board or

contained in an earlier Plan amendment, [and] (2) cannot reasonably be characterized as

reflecting the manifest intention of the Board in April, 1997." (Pl. Br. Summ. J. at 4). These two

provisions are what Plaintiffs term the "wear-away rule" contained in Section 4.06(a)(ii) of the

October 2000 Plan document and a provision of Section 4.06(b) which calculates a participant's

residual annuity based on the cash balance annuity. (Pl. Br. Summ. J. at 6).

    Plaintiffs argue that the resolutions adopted by the Board in April, 1997 ("4/97

Resolutions") are substantively different than two amendments later approved on October 16,

2000 and thus the resolutions constitute an informal amendment in violation of ERISA. (Pl. Br.

Summ. J. at 3, 6). Plaintiffs urge that these provisions were never part of a written plan document

and may not have a retroactive effect. Accordingly, Plaintiffs urge the Court to "invalidate the

application of the provisions until they are properly adopted and made available to participants

for inspection." (Pl. Br. Summ. J. at 10). If the Court were to post-date the effective date of these

provisions it seems that this would alter, and in some cases, increase the amount of benefits due

to certain Plaintiffs. (Id.).

    Defendants cross-move for summary judgment on Claims Four and Five. Defendants

argue that there was only one Plan amendment – that embodied by means of the written 4/97

_____

    [12]The Court notes that Plaintiff also alleges that Defendants violated ERISA §§ 104(b)(2)
and (b)(4), 29 U.S.C. §§ 1024(b)(2) and (b)(4), because Defendants failed to make certain Plan
documents available for inspection by Plan participants. (Pl. Br. Summ. J. at 10). However, this
claim does not appear anywhere in Complaint, nor have Plaintiffs requested leave to add such a
claim. Inasmuch as the claim has been improperly pleaded by way of Plaintiffs' brief, it will not
be addressed by the Court.

Resolutions. Defendants assert that any later resolutions merely elaborated upon the one amendment and did not constitute separate amendments.[13] Defendants thus argue that as a matter of law, Plaintiffs are unable to establish a violation of § 402 or § 404 because a written plan document existed at all relevant times containing the provisions at issue. Defendants alternately argue that the Court should grant summary judgment and dismiss these claims because Plaintiffs "are, in essence, claiming additional benefits without having exhausted their administrative remedies" and these claims are thus barred. (Def. Br. Summ. J. at 13).

### 1.     Failure to Exhaust Remedies

Defendants move for summary judgment on the basis that Plaintiffs have not properly exhausted their administrative remedies with respect to the allegations contained in Claims Four and Five. Since this issue is dispositive of the claims, the Court will address it first. The Court shall examine whether Plaintiffs are subject to the exhaustion requirement recognized by the Third Circuit for claims arising under ERISA §502(a)(1)(B), 29 U.S.C. §1052(a)(1)(B), and if subject to exhaustion, whether Plaintiffs have complied with such a requirement, or were excused.

### a.     *Applicability of Exhaustion Requirement*

Section 502(a)(1)(B) allows a participant or beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

---

[13]The subsequent resolutions occurred in November, 1997 ("11/97 Resolutions") and December, 1997 ("12/97 Resolutions").

However, before bringing a civil action, a plaintiff must first exhaust his remedies available under the Plan. Harrow v. Prudential Insurance Co. of America, 279 F.3d 244, 249 (3d Cir. 2002) (citing Weldon v. Kraft, Inc., 896 F.2d 793, 800 (3d Cir. 1990) (citations omitted)). Without first exhausting available remedies, a plaintiff may not bring a civil action pursuant to § 502. However, "a plaintiff is excused from exhausting administrative procedures under ERISA if it would be futile to do so." Harrow, 279 F.3d at 249 (citing Berger v. Edgewater Steel Co., 911 F.2d 911, 916 (3d Cir. 1990)). Before addressing futility, the Court must first examine Plaintiffs' claims to determine whether they are subject to the exhaustion requirement.

Defendants argue that although Plaintiffs cast Claims Four and Five as mere assertions of statutory rights and fiduciary duties under ERISA, these claims are really ones for benefits, more accurately arising under § 502(a)(1)(B). Thus, since § 502(a)(1)(B) claims are undisputedly subject to exhaustion, Defendants argue that Plaintiffs failed to exhaust their remedies available under the Plan and are thus barred from bringing such claims now. Defendants urge the Court to "reject [Plaintiffs'] attempt to dress up their benefit claims as 'statutory' or 'fiduciary duty' claims to avoid the exhaustion requirement." (Def. Br. Summ. J. at 16). In response, Plaintiffs argue that Claims Four and Five are purely claims of statutory rights and fiduciary duties provided by ERISA, are not claims that arise more properly under § 502(a)(1)(B) and thus are not subject to exhaustion. Further, Plaintiffs argue that even if exhaustion *had been* required, Plaintiffs exhausted their remedies and alternately, argue that they are excused from this requirement because exhaustion would be futile.

Claim Four alleges a statutory violation of § 102(a)(1), 29 U.S.C. §1102(a)(1), which stipulates that "[e]very employee benefit plan shall be established and maintained pursuant to a

14

written instrument." <u>Id.</u> Claim Five alleges a statutory violation of § 404(a)(1)(D), 29 U.S.C. §

1104(a)(1)(D), which provides that a "fiduciary shall discharge his duties with respect to a plan

solely in the interest of the participants and beneficiaries, and – ... (D) in accordance with the

documents and instruments governing the plan insofar as such documents and instruments are

consistent with the provisions of this title and title IV." (<u>Id.</u>) As a remedy for Defendants' alleged

violations of these sections, Plaintiffs request that the Court invalidate the current provisions of

the Plan which Plaintiffs allege were not present in the written Plan document until October 16,

2000. (Pl. Br. Summ. J. at 10). The effect of such invalidation would require AT&T to

retroactively apply a formula for calculating benefits that is more favorable to Plaintiffs[14] and

would require AT&T to re-compute the benefits of any participant who chose cash payment

options prior to October 16, 2000 and provide participants with the option to have their benefits

based upon the Special Update annuity.[15] (<u>Id.</u>).

        When determining whether a claim raised under ERISA actually arises under § 502, the

Third Circuit has adopted the reasoning set forth in a Fourth Circuit case, <u>Smith v. Snydor</u>, 184

F.3d 356 (4th Cir. 1999). <u>Harrow</u>, 279 F.3d 254 (adopting the analysis set forth in <u>Smith</u>). In

<u>Smith</u>, the Court analyzed a series of cases relating to the issue of whether a claim arises under §

---

        [14]As Plaintiffs term it, the calculation would be based on the "cumulative 'plus'
provision." (Pl. Br. Summ. J. at 10).

        [15]Plaintiffs state that "[p]articipants who chose cash payment options before October 16,
2000 must have their benefits computed without any retroactively-adopted restriction, i.e., their
benefit options should be based on the Special Update annuity if this was their higher benefit."
(Pl. Br. Summ. J. at 10). As described in the Honorable William G. Bassler's opinion dated
October 17, 2002, the "Special Update" was a mechanism and formula used to compute each
participant's benefit amounts following the transition to cash balance and to provide the opening
amount for each cash balance account.

502 and concluded that "a claim for breach of fiduciary duty is actually a claim for benefits where the resolution of the claim rests upon an interpretation and application of an ERISA-regulated *plan* rather than upon an interpretation and application of *ERISA*. 184 F.3d at 362. (emphasis original). In <u>Harrow</u>, the Court concluded that the plaintiff's purported fiduciary duty claim was actually a claim challenging a denial of welfare benefits under the defendants's plan re-cast as a statutory violation claim. 279 F.3d at 254. Accordingly, the <u>Harrow</u> Court affirmed the district court's conclusion that the plaintiff's claim was subject to the requirement that she first exhaust her remedies under the plan and determined that dismissal of plaintiff's claim was proper for failure to exhaust. <u>Id.</u>

It is undisputed that the AT&TMPP provided for an appeals process for participants who wished to challenge their benefits under the Plan. These provisions are set forth, in detail, in the 1998 Summary Plan Description within the section titled, "Claim and Appeal Procedures." (1998 SPD at 28-29; Def. App. at 1148-1149). This section contains procedures for participants to utilize when making a claim regarding a pension benefit, and if such a claim is denied, for appealing the determination. (<u>Id.</u>). This section identifies the AT&T Employees' Benefit Committee as the final review committee under the Plan. (<u>Id.</u> at 29; Def. App. at 1149). The committee:

> shall have sole and complete discretionary authority to determine conclusively for all parties, and in accordance with the terms of the documents or instruments governing the Plan, any and all questions arising from administration of the Plan and interpretation of all Plan provisions, determination of all questions relating to participation of eligible employees and eligibility for benefits, determination of all facts, the amount and type of benefits payable to any participant, and construction of all terms of the Plan.

16

(Id.). This portion of the SPD also contains language telling participants that "the Plan's provisions require that you pursue all your claim and appeal rights described above *before seeking any other legal recourse* regarding claims for pension benefits." (Id.) (emphasis added). The Court notes that wholly similar language is also found in Article 3 of the 1998 Restatement of the Plan. (Def. App. at 581-82).

Although Plaintiffs urge the Court to conclude that the Fourth and Fifth Claims seek to address statutory violations, and thus do not arise under § 502, the language of their own moving brief demonstrates otherwise to the Court. The crux of Plaintiffs' arguments with respect to these claims is that the Plan did not contain the "wear-away" or annuity provisions until October 16, 2000 and thus, Plaintiffs are entitled to have their benefits calculated using language contained in the Plan prior to this date. (Pl. Br. Summ. J. at 9, 10). It appears clear to the Court that Plaintiffs are asking the Court to interpret the *Plan* to determine whether it contained certain provisions as of specific dates, not merely asking the Court to interpret and apply *ERISA*. Harrow, 279 F.3d at 254 (citation omitted). Plaintiffs urge the Court to find that the Fourth and Fifth Claims do not relate to the *terms* of the Plan, but rather relate to *when* that provision was validly adopted under ERISA. (Pl. Br. Opp. Summ. J. at 3). Although the timing and effective date of any amendments to the Plan is relevant to Plaintiffs' claims, what Plaintiffs truly ask the Court to do is examine the Plan's language prior to and after October 16, 2000 and make comparisons to determine whether certain provisions existed. Even Plaintiffs' requested remedy, as set forth in their moving brief, asks the Court to re-calculate Plaintiffs' benefits according to Plaintiffs' interpretation of the Plan language. (Pl. Br. Summ. J. at 10).

Policy considerations also support this interpretation of Plaintiffs' claims. In Zipf v. Am.

Tel & Tel. Co., 799 F.2d 889 (3d Cir. 1986), the Third Circuit set forth certain policy

considerations that support the exhaustion doctrine. In relevant part, the Court stated that:

> when a plan participant claims that he or she has unjustly been denied
> benefits, it is appropriate to require participants first to address their
> complaints to the fiduciaries to whom Congress, in Section 503, assigned
> the primary responsibility for evaluating claims for benefits ...

Zipf, 799 F.2d at 892; Accord Harrow, 279 F.3d at 253. The Zipf Court also considered an

additional justification for exhaustion: deference to the plan administrator's expertise. Id. at 893.

Here, it is undisputed that AT&T is the plan administrator and that the Plan contained a claims

and appeals section as required by § 503. Since AT&T administered the Plan and had extensive

knowledge of the Plan's provisions, policy considerations provide further support for holding the

Plaintiffs subject to ERISA's exhaustion requirement.

Following Zipf, a "vast majority of cases waiving the exhaustion requirement have fallen

into two categories: (1) discrimination claims under section 510 of ERISA, or (2) failure to

provide plaintiffs with Summary Plan Descriptions, as required by ERISA." D'Amico v. CBS

Corporation, 297 F.3d 287, 291 (3d Cir. 2002) (citing Harrow, 279 F.3d 244, 253). Since

Plaintiffs have failed to demonstrate that the allegations in Claims Four or Five fall in either of

these two categories nor that these claims only involve an interpretation of ERISA, the Court

concludes that Plaintiffs' Fourth and Fifth Claims actually arise under § 502(a)(1)(B) and

Plaintiffs are subject to the exhaustion requirement that pertains to claims brought for benefits.

Harrow, 279 F.3d at 249.

18

b.      *Have Plaintiffs Exhausted their Administrative Remedies?*

Since the Court has determined that Plaintiffs' Fourth and Fifth Claims are subject to the

exhaustion doctrine, the Court must next determine whether Plaintiffs have properly exhausted

their remedies under the Plan. In opposition to Defendants' motion, Plaintiffs assert that

Defendants have waived its exhaustion defense and may not raise it now, but even without such a

waiver, that Plaintiffs have exhausted their administrative remedies before raising these claims.

(Pl. Br. Opp. Summ. J. at 2).

Plaintiffs assert that since Defendants did not raise failure to exhaust as an affirmative

defense in any of its earlier motions to dismiss under Federal Rule of Civil Procedure 12,

Defendants have waived the opportunity to raise exhaustion as an affirmative defense. (Pl. Br.

Opp. Summ. J. at 2). Plaintiffs argue that since Fed. R. Civ. P. 12(g) prohibits a party who makes

a Fed. R. Civ. P. 12 motion without raising a certain defense from raising an omitted defense in a

later motion, Defendants are barred from raising exhaustion at summary judgment. (Id. at 2-3).

Plaintiffs assert that since Defendants' third motion to dismiss requested that the Court dismiss

Claims Four and Five but made no mention of exhaustion, Defendants have effectively waived

this defense.

Defendants argue that they have not waived this defense since it was raised by way of the

Fourth and Fifth Affirmative Defenses[16] in all relevant Answers to Plaintiffs' Complaints. With

---

[16]The Fourth Affirmative Defense alleges that "Plaintiffs' claims are barred by their
failure to exhaust remedies provided by the AT&T Management Pension Plan." (Answer, p. 13).
The Fifth Affirmative Defense alleges that "Plaintiffs' claims are barred by their failure to
exhaust administrative remedies." (Id.). This language clearly raises failure to exhaust as a
defense.

respect to Plaintiffs' argument concerning Defendants' failure to raise the defense in an earlier

motion to dismiss, Defendants argue that there was no need to raise the defense at that juncture.

Defendants assert that an analysis of whether a plaintiff has sufficiently exhausted his

administrative remedies requires a Court to look outside the pleadings, and is thus a

determination inappropriate for a motion on the pleadings alone.

Federal Rule of Civil Procedure 12(g) states that a party who "makes a motion under this

rule but omits therefrom any defense or objection then available to the party ... shall not

thereafter make a motion based on the defense or objection so omitted." Fed. R. Civ. P. 12(g).

"Failure to raise an affirmative defense by responsive pleading or by appropriate motion

generally results in the waiver of that defense." Charpentier v. Godsil, 937 F.2d 859, 863 (3d Cir.

1991) (citations omitted). However, the Third Circuit also notes that failure to raise an

affirmative defense by appropriate motion "does not always result in waiver." Id.  Courts have

held that an exception to waiver exists in situations where the defendant raises the defense at a

"pragmatically sufficient time and the plaintiff was not prejudiced in his ability to respond." Id. at

864. (quoting Lucas v. United States, 807 F.2d 414, 418 (5th Cir. 1986) (citation omitted).

Here, Plaintiffs do not argue in their briefs that they have been prejudiced by Defendants'

decision to raise this defense at the summary judgment stage, rather than by way of motion to

dismiss. Defendants argue that their decision to raise the defense at summary judgment was

essentially equivalent to raising it at a "pragmatically sufficient time," Charpentier, 937 F.2d at

864, since analysis of exhaustion requires a court to go outside the pleadings.

Although this case has involved an immense amount of time and financial resources, the

preservation of which is a significant policy consideration behind the exhaustion requirement itself, this Court nevertheless determines that Defendants have not waived this defense. While the Court certainly hesitates to reach such a seemingly inefficient result, it is the result which best serves the purposes and policy underlying the exhaustion requirement.  Ultimately, the plan administrator, AT&T, is in the best position to evaluate Plaintiffs' claims for re-calculation of benefits, not the federal courts. As articulated by the Zipf Court, "[w]hen a plan participant claims that he or she has unjustly been denied benefits, it is appropriate to require participants to first address their complaints to the fiduciaries to whom Congress, in Section 503, assigned the primary responsibility for evaluating claims for benefits." 799 F.2d at 892. The Court's determination that the exhaustion requirement applies to Plaintiffs comports with the purpose and policies underlying the requirement. Accordingly, the Court finds that Defendants have not waived the right to assert failure to exhaust as an affirmative defense.

Next, the Court must determine whether Plaintiffs have exhausted their remedies available under the Plan. These remedies are contained in the "Claims and Appeals" section of the 1998 SPD and the "Administration" portion of the restated Plan and are set forth supra in this Opinion. Plaintiffs allege that they have met the exhaustion requirement since Plaintiff Smit received a letter from Brian M. Byrnes which includes the language that "there is nothing further to discuss." (Compl. ¶ 60). However, upon viewing the letter within its original context, this Court determines that Smit's actions do not amount to exhaustion of his claim on behalf of himself, let alone on behalf of any other plaintiff.

It is undisputed that on February 9, 1998 Plaintiff Smit filed a charge with the EEOC alleging that the Plan violated the Age Discrimination in Employment Act of 1967. (Pl. Stmt.

21

Facts Opp. ¶ 146; EEOC Charge No. 171980284; Def. App. at 1043). On May 18, 1998, the

EEOC issued a Dismissal and Notice of Rights with respect to Smit's charge. (Pl. Stmt. Facts

Opp. ¶ 149). On or about May 21, 1998, Smit sent Howard Burlingame[17] ("Burlingame") an e-

mail stating that the EEOC had issued him a "right to sue" letter regarding his allegations of age

discrimination. (Pl. Stmt. Facts Opp. ¶ 149; Def. App. at 1335). By letter dated May 29, 1998,

Brian M. Byrnes[18] responded to Smit on behalf of Burlingame. (Def. App. at 1336). In the letter,

Byrnes states that AT&T, in light of the EEOC's determination, "sees no reason for the Company

to alter its position that the AT&TMPP is in compliance with all applicable laws, including the

Age Discrimination in Employment Act." (Def. App. at 1336). Further, Byrnes states that

inasmuch as Smit may disagree with the company's position "there is nothing further to discuss"

and that "this letter concludes the Company's contact with you on *this* subject outside of any

legal process you may determine to undertake ...." (Id.) (emphasis added). Plaintiffs allege that

this letter from Byrnes constitutes evidence that Plaintiffs have exhausted their remedies. The

Court disagrees.

Smit's EEOC charge alleged only that the Plan violated provisions of the ADEA. It

contained no mention of the claims and appeals procedures set forth within the Plan at the time

the charge was filed, of any specific dispute regarding pension calculation, nor did it address

Defendants's alleged failure to provide a written plan document on the two provisions contested

in Claims Four and Five. Further, AT&T's response to Smit's correspondence regarding his

---

[17]Burlingame held the position of head of AT&T's Human Resources organization.

[18]Byrnes held the position of Secretary of the Compensation and Employee Benefits
Committee.

"right to sue" letter specifically states that the letter concluded the Company's contact with Smit only on the subject of alleged age discrimination. The letter does not contain any language which Plaintiffs could reasonably interpret to mean that AT&T had reviewed any claims other than ones pertaining to alleged age discrimination. Further, Plaintiffs introduce no other evidence that they have exhausted their remedies. Accordingly, the Court concludes that the letter Byrnes wrote to Smit is insufficient evidence to demonstrate that Plaintiffs exhausted their available remedies. Next, the Court must determine whether Plaintiffs meet one of the exceptions to exhaustion.

       c.     *Was Exhaustion Excused?*

Before bringing a civil action pursuant to § 502, a plaintiff must first exhaust his or her remedies available under the Plan. Harrow, 279 F.3d at 249 (citing Weldon, 896 F.2d at 800 (citations omitted)). However, this requirement is excused if a plaintiff provides a "clear and positive showing" that exhaustion is futile. Harrow, 279 F.3d at 249 (quoting Brown v. Cont'l Baking Co., 891 F.Supp. 238, 241 (E.D.Pa. 1995)); accord D'Amico, 297 F.3d at 293. Conclusory statements that amount to nothing more than "bare allegation[s] of futility" do not excuse the exhaustion requirement. Menendez v. United Food & Commercial Workers Local 450T, AFL-CIO, WL 1925787, *1-2 (D.N.J. 2005). The Third Circuit also recognizes an additional exception to exhaustion for a claim that alleges a violation of a substantive ERISA provision, like § 404. Harrow, 279 F.3d at 253 (extending the Zipf, 799 F.2d at 891, exception to claims brought under ERISA § 404).

To determine whether a plaintiff is entitled to the futility exception, a court must weigh several factors, "including (1) whether plaintiff diligently pursued administrative relief; (2)

whether plaintiff acted reasonably in seeking immediate review under the circumstances; (3)

existence of a fixed policy denying benefits; (4) failure of the [] company to comply with its own

internal administrative procedures; and (5) testimony of plan administrators that any

administrative appeal was futile." <u>Harrow</u>, 279 F.3d at 250.  It is clear that "Plaintiffs who fail to

make known their desire for benefits to a responsible party are precluded from seeking judicial

relief. <u>D'Amico</u>, 297 F.3d at 293 (citing <u>Berger</u>, 911 F.2d at 917).

   Plaintiffs argue that exhaustion is excused since pursuing their administrative remedies

would be futile. Plaintiffs rely on an allegation contained in their Third Claim for Relief in

support of this proposition. In Paragraph 60 of the Complaint, Plaintiffs argue that with respect to

the Third Claim, exhaustion was futile "because [AT&T's] correspondence with the Plaintiffs

and AT&T's Answer maintains that its cash balance plan does not violate the law." (Compl. ¶

60). Plaintiffs argue that "it would be futile to file an internal claim with company officers whose

position is already staked out." (<u>Id</u>.). Second, in a footnote contained in their opposition brief,

Plaintiffs argue that "further 'exhaustion' would be futile because Defendants already [sic] taken

a 'fixed' position as stated in pp. 18-23 of their Brief." (Pl. Br. Opp. Summ. J. at 2). It appears to

the Court that Plaintiffs interpret Defendants' arguments for summary judgment to comprise a

"fixed policy denying benefits," one of the factors set forth by the <u>Harrow</u> Court.

   If the Court were to apply the language contained in Paragraph 60 of the Complaint to the

Fourth and Fifth Claims, it is still unable to determine that Plaintiffs have successfully

demonstrated an entitlement to the futility exception. Plaintiffs have not alleged that they

diligently pursued administrative relief, nor that immediate judicial review was necessary. Nor do

Plaintiffs assert that AT&T failed to comply with its own internal administrative procedures nor

24

that a plan administrator testified that any administrative appeal would be futile. Rather, the Plaintiffs focus on the third factor articulated in Harrow: that Defendants have a "fixed policy denying benefits," allegedly evidenced by Byrnes' letter to Plaintiff Smit on May 29, 1998 and Defendants' legal position on Claims Four and Five in the moving brief. Id. at 250.

As discussed, supra, the letter which Byrnes wrote to Plaintiff Smit did not reference any allegation present in Claim Four or Five. (Def. App. at 1336). Rather, the language was directed towards Smit's EEOC charge based on age discrimination under the ADEA and made no reference to the "wear away" or annuity provisions. Plaintiffs however, allege that this letter, in conjunction with AT&T's Answer, demonstrate AT&T's commitment to the position that its cash balance plan does not violate the law. (Compl. ¶ 60). In its appropriate context, Byrnes' letter states that "we see no reason for the Company to alter its position that the AT&TMPP is in compliance with all applicable laws, including the Age Discrimination in Employment Act." (Def. App. at 1336). However, the Court will not interpret this statement to operate as a "fixed position" regarding Plaintiffs' potential claims regarding the "wear away" and annuity provisions.

Plaintiffs' attempt to rely on the Defendants' moving brief as evidence that Defendants have adopted a fixed position finds no support in the law. The case which Plaintiffs cite to in support of this proposition, Berger, 911 F.2d 911 (3d Cir. 1990), does not provide support to Plaintiffs' argument. Rather, in Berger, it was clear that the company had adopted a fixed practice of denying certain claims brought by participants, which was enough for the district court to excuse exhaustion. Id. at 916-17. Here, however, Plaintiffs have not demonstrated that the legal arguments set forth in Defendants' brief do more than provide a litigation stance. The

25

Court is not willing to construe a legal position taken in response to a civil action as sufficient evidence that resort to administrative remedies would be futile, especially where Plaintiffs have failed to offer any reason for the Court to do so.

Plaintiffs also allege that exhaustion is excused for Claim Five since this claim alleges that AT&T breached its fiduciary duty to maintain a written plan in violation of § 404. If the Court were to accept Plaintiffs' characterization of Claim Five, this claim could fall into the exhaustion exception for violations of substantive ERISA provisions discussed supra. The rationale behind this exception is that a claim involving a breach of fiduciary duty involves no administrative expertise and thus exhaustion serves no real purpose. Zipf, 799 F.2d at 892-93. However, the Court reiterates that "Plaintiffs cannot circumvent the exhaustion requirement by artfully pleading benefit claims as breach of fiduciary duty claims." Harrow, 279 F.3d at 253 (citation omitted). The Third Circuit has adopted the standard set forth in Smith, 184 F.3d at 362, for determining when a claim for breach of fiduciary duty is actually a claim for benefits. Harrow, 279 F.3d at 254. The test is whether the resolution of the claim will rest "upon an interpretation and application of an ERISA-regulated *plan* rather than upon an interpretation and application of *ERISA*." Id. (quoting Smith, 184 F.3d at 362) (emphasis original). If a plaintiff cannot allege facts that, if proven, would establish a breach of fiduciary duty independent of a claim for benefits, exhaustion cannot be excused. Harrow, 279 F.3d at 254.

Here, the Court is unable to discern a true distinction between the remedies which Plaintiffs seek for Claims Four and Five. If the Court were to grant Plaintiffs' requested remedy, AT&T would have to re-calculate the benefits of any participant who chose cash payment options before October 16, 2000 based upon the Special Update annuity if that were the

participant's highest benefit. (Pl. Br. Summ. J. at 10).  Although Claim Five addresses an alleged breach of AT&T's fiduciary duty owed to Plaintiffs, the Court determines that this claim still asks the Court to interpret terms of the Plan to analyze whether certain language was included as of certain time periods, rather than interpret and apply ERISA. The Court concludes that Claim Five, although structured as a fiduciary duty claim, is best treated as a claim for benefits subject to the exhaustion doctrine because it asks the Court to interpret the contents of and terminology used in the Plan. Since the parties dispute the characterization of the Plan language, the Court's analysis must *necessarily* turn on an interpretation of the Plan language. The Court thus determines that Plaintiffs are not entitled to an exception to exhaustion based on their § 404 claim.

It is undisputed that proper administrative procedures existed within the Plan that Plaintiffs could have pursued before bringing Claims Four and Five. Plaintiffs have failed to demonstrate that exhaustion was unnecessary, that they have exhausted their remedies or that exhaustion would be futile. For the foregoing reasons, the Court will grant Defendants' motion for summary judgment and denies the motion of Plaintiffs with respect to Claims Four and Five. These claims are dismissed without prejudice to be re-filed once Plaintiffs have exhausted their administrative remedies.[19]

### 2.    Remaining Arguments

Since the Court has determined that Plaintiffs have failed to exhaust their administrative remedies for Claims Four and Five, these claims are summarily dismissed without prejudice for

---

[19]Since this does not constitute a ruling on the merits of Plaintiffs' claims, the Court will dismiss these claims without prejudice. D'Amico, 297 F.3d at 293-94.

Plaintiffs to pursue their administrative remedies. Accordingly, the Court does not deem it necessary to reach the merits of the parties' remaining arguments. As such, dismissal of Claims Four and Five shall not operate as a determination on the merits of these claims.

## C.   Counts Six and Seven: Misleading Plan Description and Resulting Breach of Fiduciary Duty

Plaintiffs move for summary judgment on the Sixth and Seventh Claims of the Complaint.[20] In the Sixth Claim, Plaintiffs allege that the Summary Plan Description ("SPD") provided to employees in 1998 was "not 'written in a manner calculated to be understood by the average plan participant,' and was not 'sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan,'" in violation of § 102, 29 U.S.C. § 1022. (Compl. ¶ 64). Specifically, Plaintiffs allege that the SPD does not disclose that:

> the 'new' features: (a) significantly reduce the rate of future benefit accruals; (b) cause older participants to earn no additional benefits beyond those already earned; (c) use conversion factors to compute the initial Cash Balance that are not based on the most valuable annuity offered under the 'old' formula; (d) base benefits on year-by-year salary, whereas the 'old' formula based them on compensation in a final pay base averaging period; and (e) do not offer undiscounted retirement benefits at age 55. In addition, illustrative examples in the SPD intentionally omit comparisons of benefits under the 'old' and the 'new' formulas.

---

[20]Since the Sixth and Seventh Claim both pertain to alleged deficiencies in the 1998 SPD, and Plaintiffs repeatedly refer to Defendants' alleged violation of § 102 in terms of "fiduciary duty," the Court has determined that these two claims are best addressed within the same portion of this Court's Opinion. See Pl. Br. Summ. J. at 28, 30 (referencing § 102 duties and fiduciary duties); Pl. Br. Summ. J. at 32-33 (discussing proof of detrimental reliance within the context of a fiduciary duty claim).

(Compl. ¶ 63).[21] Further, Plaintiffs allege that the SPD was not "distributed to employees in a manner reasonably calculated to ensure actual receipt by the employees." (Compl. ¶ 65). As evidence of this, it is alleged that certain Plaintiffs did not receive the SPD until AT&T added it as an exhibit in this action in December, 1998. Plaintiffs' Seventh Claim alleges that Defendants violated the fiduciary duty to keep beneficiaries fully informed as set forth in § 404, 29 U.S.C. § 1104. Specifically, Plaintiffs allege that Defendants failed to disclose, or alternatively made deceptive or uninformative disclosures, regarding "the disadvantages of the 'new' cash balance features and transition provisions, compared to the 'old' defined benefit plan." (Compl. ¶ 66). This claim alleges both a non-disclosure and misrepresentation-based breach of fiduciary duty.

Defendants cross-move for summary judgment on both claims. With respect to Claim Six, AT&T argues that ERISA does not require the SPD to contain the information which Plaintiffs allege is lacking. Defendants also assert that Plaintiffs are unable to demonstrate that the SPD was not written in an understandable manner nor that it was inaccurate or less than comprehensive. Further, Defendants argue that the SPD was properly distributed by third-class mail to participants such that its distribution did not violate § 102 nor the applicable regulations. Finally, Defendants argue that since Plaintiffs cannot demonstrate the existence of "extraordinary circumstances," ERISA cannot provide their requested remedy. Defendants request that Plaintiffs' Sixth Claim be dismissed with prejudice.

---

[21]In moving and opposition briefing, Plaintiffs also invoke language which refers to Defendants's fiduciary responsibilities in conjunction with issuance of the SPD, section 204(h) notice rules, and rules governing the issuance of a summary of material modification ("SMM"). However, since these claims have not been properly pled in the Complaint within the context of Plaintiffs' Sixth Claim, the Court will disregard any arguments relating to them for the purposes of this motion.

In Claim Seven, Defendants assert that there is no general fiduciary duty to keep beneficiaries informed as Plaintiffs allege. Specifically, to the extent that Plaintiffs' claim relates to an actionable breach based on failure to disclose, Defendants argue that Plaintiffs fail to state such a claim. AT&T claims that it was unnecessary to disclose purported "disadvantages" of the new Plan as compared to the old Plan because Defendants did not give participants the option of choosing between them. To the extent that Plaintiffs' claim is one based on misrepresentation, Defendants allege that this claim must fail since Plaintiffs have not alleged and proven the requisite elements. Defendants also move for summary judgment on the basis that Plaintiffs may not sustain a fiduciary duty-based claim since any alleged SPD-related violations are specifically and exclusively addressed by other ERISA provisions.

### 1.    Legal Standards

ERISA has "an elaborate scheme in place for enabling beneficiaries to learn their rights and obligations at any time, a scheme that is built around reliance on the face of written plan documents." Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 83 (1995).

### a.    *Section 102 of ERISA*

Section 102 of ERISA requires plan administrator to furnish a summary plan description of any employee benefit plan to participants and beneficiaries. 29 U.S.C. § 1022(a). A plan administrator must furnish an SPD to each participant and beneficiary every fifth year or within 210 days of any material modification to the plan. 29 U.S.C. § 1024(b)(1)(B). The SPD "shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries

of their rights and obligations under the plan." (Id.). The applicable labor regulations stipulate that the format of the SPD "must not have the effect to [sic] misleading, misinforming or failing to inform participants and beneficiaries." 29 C.F.R. 2520.102-2(b). Further, the SPD must not minimize or obscure "any description of exception, limitations, reductions, and other restrictions of plan benefits." (Id.). The plan's advantages and disadvantages "shall be presented without either exaggerating the benefits or minimizing the limitations." (Id.).

Section 102(b) of ERISA sets forth specific requirements regarding the content of every conforming SPD. 29 U.S.C. § 1022(b). In relevant part, the statute requires every SPD to contain:

> [t]he name and type of administration of the plan ... the plan's requirements respecting eligibility for participation and benefits; a description of the provisions providing for nonforfeitable pension benefits; circumstances which may result in disqualification, ineligibility, or denial or loss of benefits ....

29 U.S.C § 1022(b). The SPD must be distributed by use of "measures reasonably calculated to ensure actual receipt of the material by plan participants and beneficiaries" and "must be sent by a method or methods of delivery likely to result in full distribution." 29 C.F.R. 2520.104b-1(b)(1). Materials which are distributed by the mails may be sent first, second or third-class mail, but use of second or third-class mail is only acceptable if "return and forwarding postage is guaranteed and address correction required." (Id.). Any such material that is returned with a corrected address must be re-sent by first-class mail or personally delivered to the participant at his or her work-site. (Id.).

      b.    *Section 404 of ERISA*

Under ERISA, an employer that also serves as a plan administrator, like Defendants in

this case, is a fiduciary that is required to "discharge its duties solely in the interests of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1); Fischer v. Phila. Elec. Co., 994 F.2d 130, 133 (3d Cir. 1993) ("Fischer I"). Therefore, when a plan administrator explains plan benefits to its employees, it acts in this fiduciary capacity. Int'l Union, United Auto., Aerospace & Agr. Implement Workers v. Skinner Engine Comp., 188 F.3d 130, 148 (3d Cir. 1999). Section 404(a) of ERISA, 29 U.S.C. § 1104, is the touchstone for understanding the scope and object of an ERISA fiduciary's duties. Bixler v. Central Pennsylvania Teamsters Health & Welfare Fund, 12 F.3d 1292, 1299 (3d Cir. 1993). The section establishes that a fiduciary shall act exclusively for the benefit of participants and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

The Third Circuit has repeatedly held that a fiduciary in this context may not materially mislead those to whom these statutory duties of loyalty and prudence are owed. In re Unisys Sav. Plan Litig., 74 F.3d 420 (3d Cir. 1996); Curcio v. John Hancock Mut. Life Ins. Co., 33 F.3d 226, 238 (3d Cir. 1994); Bixler, 12 F.3d at 1300; Fischer I, 994 F.2d at 135. Thus, a plan administrator breaches its fiduciary duty under ERISA if it makes material misrepresentations to plan participants concerning employee benefits. "Put simply, when a plan administrator speaks, it must speak truthfully." Fischer I, 994 F.2d at 135. The breadth of the fiduciary duty is not limited to a prohibition of affirmative misrepresentations, as the duty "entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful." Bixler, 12 F.3d at 1300. Therefore, the failure to give certain relevant

32

information regarding benefits to beneficiaries might lead to liability if the administrator fails to communicate "those material facts, known to the fiduciary but unknown to the beneficiary, which the beneficiary must know for its own protection."Glaziers & Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Sec., Inc., 93 F.3d 1171, 1182 (3d Cir.1996). The knowledge of the fiduciary may give rise to such a duty to disclose even in the absence of a specific request by the beneficiary because "absent such information, the beneficiary may have no reason to suspect that it should make inquiry into what may appear to be a routine matter." Glaziers, 93 F.3d at 1181.

Overall, a successful claim for breach of fiduciary duty under ERISA for a misrepresentation requires a plaintiff to demonstrate that: (1) defendant company was acting as a fiduciary; (2) defendant made affirmative misrepresentations or failed to adequately inform plan participants and beneficiaries; (3) the information misrepresented or not disclosed was material; and (4) plaintiffs relied on the misrepresentation to their detriment. See Horvath v. Keystone Health Plan East, Inc., 333 F.3d 450, 459 (3d Cir. 2003); Daniels v. Thomas & Betts Corp., 263 F.3d 66, 73 (3d Cir. 2001); International Union, United Auto., 188 F.3d at 148; In re Unisys Corp. Retiree Med. Benefits "ERISA" Litig., 57 F.3d 1255, 1264-1265 (3d Cir.1995) ("Unisys I"). A misleading statement or omission is material if there is a "substantial likelihood" that the misrepresentation would "mislead a reasonable employee in making an adequately informed decision about if and when to retire."  Unisys I, 57 F.3d at 1264.

### 2.    Analysis

Although Claims Six and Seven contain similar allegations based upon the action and

33

inaction of Defendants, each arises under a different statutory provision. By way of preliminary matter, the Court notes that despite Plaintiffs' attempt to structure these claims as arising under § 102 and § 404, ERISA does not provide an automatic cause of action for the violation of *every* provision. Rather, ERISA provides specific enforcement provisions. In this case, it appears that Plaintiffs should have pursued their § 102 and § 404 claims by way of § 502 since this section provides a specific cause of action for statutory violations of ERISA. As such, the Court will address these claims within the context of this statutory provision.

      a.     *Claim Seven: Section 404 and 502(a)(3) of ERISA*

The Court will now address Plaintiffs' claim for equitable relief under section 502 based upon Defendants' alleged breach of fiduciary duty in connection with the issuance of the SPD. It is first necessary to determine whether Plaintiffs may properly raise a claim for equitable relief under § 502 for AT&T's alleged violation of § 404 despite their available remedies under § 502(a)(1)(B). Section 502(a)(1)(B) states that a "(a) ... civil action may be brought – (1) by a participant or beneficiary – ... (B) ... to enforce his rights under the terms of the plan." Id. This section allows an individual participant or beneficiary of a plan to enforce his rights, and to bring an action for violation of an ERISA provision, such as § 102. Section 502(a)(3) provides that "(a) ... [a] civil action may be brought – ... (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

Courts have construed this "catchall" section to allow individual beneficiaries to recover

equitable relief for breaches of fiduciary duties by plan fiduciaries. See Varity Corp. v. Howe, 516 U.S. 489, 515 (1996); Ream v. Frey, 107 F.3d 147, 153 (3d Cir. 1997). The Third Circuit has adopted Justice Brennan's concurrence in the Supreme Court case, Massachusetts Mutual Life Ins. Co. v. Russell, 473 U.S. 134 (1985), holding that Section 502(a)(3) authorizes a court to award "appropriate equitable relief" directly to a participant to "'redress *any* act or practice which violates *any* provision of this title' including a breach of the statutorily created fiduciary duty of an administrator." Bixler, 12 F.3d at 1298 (quoting Massachusetts Mutual, 473 U.S. at 153) (emphasis in original)).

It thus appears initially that § 502(a)(3) may afford Plaintiffs an equitable remedy[22] for Defendants' alleged breach of the fiduciary duty to keep beneficiaries informed as raised in Claim Seven. Specifically, Plaintiffs allege that Defendants' failure to fully explain and disclose the relative values of the different options offered to Plaintiffs at the time of the cash balance transition breached Defendants' fiduciary duty to keep the Plaintiffs, as beneficiaries, informed. (Pl. Br. Summ. J. at 35-37). Plaintiffs' Complaint does not appear to request monetary damages based on the alleged breach, and thus, the Court will construe this claim as one which seeks an equitable remedy.

The Supreme Court and the Third Circuit, however, have limited the availability of an action seeking equitable relief under § 502(a)(3) for breach of fiduciary duty to situations where ERISA does not provide a plaintiff with an alternate remedy. Varity, 516 U.S. at 515; Ream, 107

---

[22]The Court notes that on Page 35 of the Plaintiffs' Brief for Summary Judgment, the Plaintiffs assert that "the appropriate equitable relief for AT&T's deliberately inadequate disclosures is to continue the features of the prior formula whose elimination or modification was not disclosed." (Pl. Br. Summ. J. at 35).

F.3d at 152. In <u>Varity</u>, plaintiffs sued their employer, the plan administrator, claiming that the employer violated its fiduciary obligations when it tricked employees into withdrawing from its welfare benefit plan established under ERISA. 516 U.S. at 492. Plaintiffs sought an order from the court which would reinstate each plaintiff as a participant in the plan. <u>Id.</u> The district court entered summary judgment for the employees and defendants appealed. <u>Id.</u> On appeal, the Supreme Court determined that plaintiffs who were no longer plan members were authorized to bring an action under the catchall provision, § 502(a)(3), for appropriate equitable relief based on defendants's breach of fiduciary duty. <u>Varity</u>, 516 U.S. at 515. The Court based its reasoning in that case on the fact that Plaintiffs had no other available remedy under ERISA for the alleged misrepresentations other than § 502(a)(3). <u>Id.</u>

In <u>Varity</u>, plaintiffs were no longer members of the plan at issue and thus could not bring an action under § 502(a)(1)(B) to enforce their right to information, nor could plaintiffs proceed under § 502(a)(2) because that provision does not provide a remedy to individual beneficiaries. <u>Id.</u> The <u>Varity</u> Court reasoned that § 502(a)(3) should be available to plaintiffs "for injuries caused by violations that § 502 does not elsewhere adequately remedy." <u>Id.</u> at 512. However, as stated by the Third Circuit, "[w]here Congress otherwise has provided for appropriate relief for the injury suffered by a beneficiary, further equitable relief ought not be provided." <u>Ream</u>, 107 F.3d at 152.

Here, to the best of this Court's knowledge, Plaintiffs are currently members of the AT&TMPP and thus, have the ability to proceed under § 502(a)(1)(B) for Defendants' alleged violation of § 102. The <u>Varity</u> decision is thus inapplicable since Plaintiffs possess an alternative means to recover for Defendants' alleged failure to disclose certain information in the SPD. The

Court does not thus determine that they may also sustain a claim under § 502(a)(3) for an alleged

breach of fiduciary duty based upon a violation of § 102 or other ERISA section relating to

SPD's. Summary judgment is hereby granted to Defendants and denied as to Plaintiffs. The

Court does not thus deem it necessary to reach any remaining arguments of the parties with

respect to this claim. Claim Seven is hereby dismissed with prejudice.

        b.    *Claim Six: Section 102 of ERISA*

Plaintiffs allege that through the SPD, "AT&T informed its employees that the 'best

features' of the existing plan were being preserved and that their benefits 'will grow steadily'

under cash balance."[23] (Pl. Br. Summ. J. at 30). Plaintiffs assert that comparative information

relating to the old and new plans was suppressed and that "restrictions on the actual payment of

the cash balance plan's pay and interest credits were 'minimized, rendered obscure or otherwise

made to appear unimportant'" within the SPD in violation of 29 C.F.R. 2520.102-2(b). Plaintiffs

repeatedly allege that the SPD failed to disclose "benefit reductions" which occurred as a result

of the transition to cash balance. In their submissions to the Court, Plaintiffs allege that the SPD

distributed in 1998 was "not written in a manner calculated to be understood by the average plan

participant" and was not "sufficiently accurate and comprehensive to reasonably apprise such

participants and beneficiaries of their rights and obligations under the plan" in violation of § 102.

29 U.S.C. § 1022(a). Further, Plaintiffs allege that the summary plan description was not

distributed in a manner that ensured "actual receipt" by each participant. See 29 C.F.R.

---

[23]However, the Court notes that the preceding statement of the Plaintiffs relies upon
conclusions contained within the expert reports of both Stratman and Poulin , *not* the language of
the SPD itself as it appears from the text of Plaintiffs' brief.

2520.104b-1(b). Plaintiffs also base their allegation that Defendants violated § 102 and its applicable regulations on their claim that AT&T did not distribute the SPD in a manner which ensured "actual receipt" nor did Defendants keep records of the mailings.

Claim Six asserts various content-based and distribution-based objections to the SPD. Plaintiffs rely on the report of their actuarial expert, Poulin, for their argument that the SPD does not disclose that the cash balance conversion reduces benefits and how those reductions occur in violation of § 102(a)(1). (Pl. Br. Summ. J. at 25). Poulin identified four features of the Plan which allegedly cause participants to "lose benefits they might otherwise reasonably expect to receive" after conversion, including his observations that: "(a) the rate of future benefit accruals is significantly lower, with further drops after age 55; (b) the initial cash balance accounts often represent less than one-half of the value of the participant's previously accrued benefits at age 55; (c) the conversion factors used to establish those initial account balances favored younger employees over older employees; and (d) by establishing the initial account balances at as low as one-half of the value of previously-earned benefits and then providing that participants can receive future cash balance accruals only in conjunction with those initial account balances, AT&T created up to 13 year wear-aways during which participants earned no additional benefits." (Pl Br. Summ. J. at 25). These allegations are presented in detail in ¶¶ 173-184 of the Plaintiffs' Statement of Material Facts.

Plaintiffs also enlisted their communications expert, James Stratman[24] ("Stratman"), to

_____

[24]The Court notes that the parties presently dispute the qualifications of Stratman and the relevancy of his testimony and conclusions. However, for the purposes of the instant analysis, these challenges are irrelevant.

analyze the SPD in an effort to determine whether Poulin's identified changes were disclosed in

the document. (Pl. Br. Summ. J. at 26). Stratman concluded that the SPD failed to adequately

explain changes AT&T made to the early retirement schedule and determined that the plan

description and accompanying brochures "actually misled participants as to some of them." (Pl.

Br. Summ. J. at 26).

　　　As a remedy for Defendants' alleged violations, Plaintiffs request the Court to grant

equitable relief. (Pl. Br. Summ. J. at 32-35). Plaintiffs state that the "appropriate equitable relief

for AT&T's deliberately inadequate disclosures is to continue the features of the prior formula

whose elimination or modification was not disclosed," (Pl. Br. Summ. J. at 35), seemingly a

claim under § 502(a)(3) for "other appropriate equitable relief" since Plaintiffs make no claim for

money damages. 29 U.S.C. 1132(a)(3).  Since Plaintiffs request equitable relief for Defendants'

alleged violations of § 102, this Court must first determine whether Plaintiffs may properly state

a claim for appropriate equitable relief based upon a violation of section 102 of ERISA before

reaching the merits of such claims.

　　　Claim Six alleges that AT&T committed various reporting and disclosure violations in

conjunction with the issuance of the SPD. Courts in this Circuit construe such violations to

constitute "procedural violations" of ERISA. See Hozier v. Midwest Fasteners, Inc., 908 F.2d

1155, 1168 (3d Cir. 1990). The Third Circuit recognizes only two causes of action that apply to

remedy procedural violations. Id. at 1167. The first, § 502(a)(4), allows a plan participant to sue

"for appropriate relief" in the case of violations of § 105(c) of ERISA, a section not raised at any

point in the Complaint before this Court. For all other reporting and disclosure violations, an

aggrieved plan participant must bring an action under § 502(a)(1)(A) "for the relief provided in

[section 502(c)]." 29 U.S.C. § 1132(a)(1)(A). In relevant part, § 502(c) holds an administrator

personally liable to the participant for an amount not to exceed $100 per day for each day the

administrator refuses to turn over requested information, or for "such other relief as [the court]

deems proper." 29 U.S.C. § 1132(c)(1) - (3). Significantly, however, § 502(c) does not appear to

provide a specific remedy for an administrator's failure to comply with the requirements of

§ 102.[25]

  After reviewing the Complaint and subsequent submissions to the Court, it does not

appear that Plaintiffs allege claims which arise under either § 502(a)(4) or § 502(a)(1)(A), the

only provisions available to remedy procedural violations of ERISA. Rather, it appears to the

Court that Plaintiffs structure Defendants' alleged reporting and disclosure and distribution

violations into claims arising under § 502(a)(1)(B) to recover pension benefits "due to [them]

under the terms of [their] plan," 29 U.S.C. § 1132(a)(1)(B) and for appropriate equitable relief

under § 502(a)(3), 29 U.S.C. § 1132(a)(3), a claim of equitable estoppel.

  In Hozier, the Third Circuit rejected the Ninth Circuit's holding in Blau v. Del Monte

Corp., 748 F.2d 1348 (9th Cir. 1984), cert denied 474 U.S. 865 (1985), and held that "[t]he injury

produced by reporting and disclosure violations as such is remediable under ERISA, of course,

---

  [25]In the view of this Court, the language of § 502(c) which may provide equitable relief to
Plaintiffs can be found in § 502(c)(3). This provision states that "[a]ny employer maintaining a
plan who fails to meet the notice requirement of § 101(d) ... or who fails to meet the
requirements of § 101(e)(2) ... or who fails to meet the requirements of § 302(d)(12)(E) ... may in
the court's discretion be liable to such participant or beneficiary or to such person in the amount
of $100 a day from the date of such failure, *and the court may in its discretion order such other
relief as it deems proper.*" 29 U.S.C. § 1132(c)(3) (emphasis added). However, Plaintiffs make
no reference to this provision in any submission to the Court. Accordingly, the Court will not
proceed with a substantive analysis of § 502(c)(3).

just not remediable under section 502(a)(1)(B)." Hozier, 908 F.2d at 1169. The Hozier Court analyzed the detailed remedial scheme of ERISA and concluded that if Congress had meant to offer section 502(a)(1)(B) as a remedy for procedural violations, it would have done so. Id. Instead, the Court determined that "a participant aggrieved by any reporting and disclosure violation has an available, though limited, remedy under section 502(a)(1)(A)." Id. The Hozier Court declined to employ section 502(a)(1)(B) "as a device to undercut the limitations built into section 502(a)(1)(A)" and affirmed the district court's grant of summary judgment to defendants with respect to this claim. Id. at 1170.

The Third Circuit has "repeatedly held that under ordinary circumstances defects in fulfilling the reporting and disclosure requirements of ERISA do not give rise to a substantive remedy other than that provided for in section 502(a)(1)(A) of that Act." Ackerman v. Warnaco, Inc., 55 F.3d 117, 124 (3d Cir. 1995) (citations omitted). In Jordan v. Federal Express Corp., 116 F.3d 1005, 1011 (3d Cir. 1997), the Third Circuit determined that the district court had properly dismissed the plaintiff's § 502(a)(3) claim based upon defendants' alleged statutory reporting and disclosure violations. The Court noted that the Circuit had "previously held that 'substantive remedies are generally not available for violations of ERISA's reporting and disclosure requirements'" and thus, dismissal of the plaintiffs' § 502(a)(3) claim for equitable remedies was appropriate. Id. (quoting Ackerman, 55 F.3d at 124).

Defendants here, oppose and move for summary judgment on the basis that Plaintiffs request substantive, equitable relief that is unavailable to remedy violations of ERISA's reporting and disclosure requirements. (Def. Br. Summ. J. at 41-42). Plaintiffs, however, assert that the Third Circuit's decision in Burstein v. Ret. Account Plan for Employees of Allegheny Health

41

Educ. & Research, 334 F.3d 365 (3d Cir. 2003), is the controlling precedent, and allows

substantive relief for inadequate disclosures in an SPD. (Pl. Br. Opp. Summ. J. at 30).

Defendants argue in response that Burstein does not support this proposition since the case did

not involve a claim like Plaintiffs', that is, one based upon disclosure and reporting violations.

(Def. Br. Reply at 15). This Court agrees.

    The plaintiffs in Burstein raised an equitable estoppel claim, a claim for benefits based on

a conflict between the language of the plan and of the SPD, and a claim for the administrator's

alleged breach of fiduciary duty. Burstein, 334 F.3d 365. Although Burstein involved a cash

balance plan, it shows no further similarity to the case presently before this Court and thus is

inapplicable to Plaintiffs' contention that Plaintiffs are able to recover substantive relief for

AT&T's alleged violations of ERISA's reporting and disclosure provisions. In Burstein, the

plaintiff raised an equitable estoppel claim which the Court analyzed under § 502(a)(3) of

ERISA, 29 U.S.C. § 1132(a)(3). Id. at 383. The court of appeals affirmed the district court's

dismissal of this claim, invoking the holding in another Third Circuit case, Kurz v. Philadelphia

Elec. Co., 96 F.3d 1544, 1553 (3d Cir. 1996). Burstein, 334 F.3d at 383. In Kurz, the Court noted

that "we [the Third Circuit] have consistently rejected estoppel claims based on simple ERISA

reporting errors or disclosure violations, such as a variation between a plan summary and the plan

itself, or an omission in the disclosure documents." 96 F.3d at 1553 (citation omitted).

    Thus, to the extent that Plaintiffs attempt to assert an independent right of action under

section 102 of ERISA against AT&T for its alleged violations of the reporting and disclosure

requirements, this Court is inclined to dismiss this separate cause of action since Plaintiffs are

unable to bring a claim under either § 502(a)(1)(B) or § 502(a)(3) of ERISA.

However, despite the fact that substantive remedies are generally unavailable for violations of ERISA's reporting and disclosure requirements, the Third Circuit recognizes an exception for situations "where the plaintiff can demonstrate the presence of 'extraordinary circumstances.'" Ackerman, 55 F.3d at 124-25 (citing Gridley v. Cleveland Pneumatic Co., 924 F.2d 1310, 1319 (3d Cir. 1991)). This situation is akin to that of an equitable estoppel claim under § 502(a)(3)(B) of ERISA. To successfully make a case for equitable estoppel under ERISA, a plaintiff must establish (1) the existence of a material representation; (2) reasonable and detrimental reliance on the misrepresentation, and (3) extraordinary circumstances. Int'l Union, United Automobile, 188 F.3d at 151.

"A material representation is defined as 'any provision of a plan subject to ERISA that establishes a benefit.'" Gashlin v. Prudential Ins. Co. of America Retirement System for U.S. Employees and Special Agents, 286 F. Supp 2d 407, 419 (D.N.J. 2003) (quoting Curcio v. John Hancock Mutual Life Insurance Co., 33 F.3d 226, 237 (3d Cir. 1994). "Reasonable and detrimental reliance is established when a claimant suffers an injury because he reasonably relied upon a material representation." Gashlin, 286 F. Supp 2d at 420 (citing Curcio, 33 F.3d at 237). In this Circuit, courts have interpreted the requirement of "extraordinary circumstances" to include "[s]uch circumstances ... where the employer has acted in bad faith, or has actively concealed a change in the benefit plan, and the covered employees have been substantively harmed by virtue of the employer's actions." Ackerman, 55 F.3d at 125 (citations omitted).

The Third Circuit to date has not provided a clear definition of what circumstances rise to the level of "extraordinary." Rather, it has been noted that the Third Circuit has "rel[ied] upon case law to establish its parameters." Kurz, 96 F.3d at 1553. In order to successfully demonstrate

extraordinary circumstances, this Circuit has required plaintiffs to show affirmative acts of fraud or inequitable conduct by an employer, continuing misrepresentations over a course of dealing, or plaintiffs' particular vulnerability. Kurz, 96 F.3d at 1553. Most relevant here, the Third Circuit has held that extraordinary circumstances may exist where a plaintiff repeatedly and diligently makes inquiries regarding benefits and the defendant repeatedly misrepresents the scope of offered benefits to the plaintiff. Smith, 6 F.3d at 142.

The Third Circuit has "acknowledged that reporting and disclosure violations can 'wreak especially substantial harm' in the context of a dispute over the validity of a plan alteration." Ackerman, 55 F.3d at 125 (quoting Hozier, 908 F.2d at 1168-69 n. 15). However, the instances of extraordinary circumstances cited supra "demonstrate that a plaintiff must do more than merely make out the 'ordinary elements' of equitable estoppel to establish a claim for equitable estoppel under ERISA." Kurz, 96 F.3d at 1553. (citations omitted). "Because of these heightened requirements, [the Circuit] ha[s] consistently rejected estoppel claims based on simple ERISA reporting errors or disclosure violations, such as a variation between a plan summary and the plan itself, or an omission in the disclosure documents." Kurz, 96 F.3d at 1553 (citing Gillis v. Hoechst Celanese Corp., 4 F.3d 1137, 1142 (3d Cir. 1993); Gridley, 924 F.2d at 1219).

In Ackerman, the Court reversed the district court's grant of summary judgment for the defendants on plaintiffs' claim that defendants acted in bad faith and actively concealed the rescission of a portion of a welfare benefits plan. 55 F.3d at 125. The Third Circuit determined that genuine issues of material fact existed with respect to defendants' behavior in disclosing or concealing certain changes to the benefits plan which were not appropriate for summary judgment. Id. In Ackerman, the plaintiffs alleged that explanatory meetings were scheduled but

44

never held, a plan handbook was never distributed to employees explaining the change, and a

letter from a company executive only referred to "changes" to the severance plan, not the total

elimination thereof. Id. at 124. In response, defendants explained that these allegations were the

product of "mere bureaucratic 'bungling.'" Id. at 125. The district court accepted this

explanation, but the Third Circuit instead reversed and remanded for further findings relating to

these allegations. Id.

        Here, Defendants move for summary judgment on the basis that Plaintiffs have not, and

cannot, prove the existence of extraordinary circumstances as needed to proceed with Claim Six.

Plaintiffs respond that they have sufficiently demonstrated that AT&T actively concealed less

favorable parts of the SPD from participants which satisfies the Third Circuit interpretation of

extraordinary circumstances. (Pl. Br. Opp. Summ. J. at 32). In support of their contention that

Defendants engaged in active concealment, Plaintiffs cite to minutes of communications

meetings discussing the cash balance transition, opinions of AT&T managers garnered during

focus groups, deposition testimony, a videotape and various other documents. (Pl. Br. Opp.

Summ. J. at 32). Plaintiffs allege that "[i]n this case, active concealment permeates the record."

(Pl. Br. Opp. Summ. J. at 32).

        The Court will now evaluate Plaintiffs' arguments and citations to the record to determine

whether, as a matter of law, Plaintiffs successfully demonstrate the presence of active

concealment. The Court will limit its analysis of this element to allegations concerning the

contents of the SPD, rather than distribution methods since Plaintiffs do not allege extraordinary

circumstances in conjunction with distribution of the SPD. Significantly, the Court notes that

Plaintiffs bear the burden of proof on all elements of an equitable estoppel claim, including

extraordinary circumstances. See Gillis, 4 F.3d 1137, 1142 (3d Cir. 1993).

First, Plaintiffs allege that "minutes of communications meetings specifically talk about not disclosing the 'bad parts' of cash balance and ask 'Why would we want to tell people that the special update is higher than Cash Balance?'" (Pl. Br. Opp. Summ. J. at 32). Assuming arguendo that Defendants do not object to the admissibility of these meeting minutes, the Court nevertheless determines that these documents do not demonstrate active concealment. The record contains language set forth in various "Meeting Notes" which reflects AT&T's desire to "sell Cash Balance" to participants by refraining from telling "the bad parts upfront." (Meeting Notes, 9/12/97 Meeting; Pl Exh 73 at 1). However, statements like these, and others cited to by Plaintiffs, do not demonstrate that AT&T attempted to withhold, or withheld, the "bad parts" of cash balance altogether. Rather, it appears to the Court that AT&T was cognizant of the possibility that the implementation of cash balance was likely to receive negative feedback from employees and wished to reduce this type of occurrence.[26] The record does not reflect, nor do Plaintiffs demonstrate to this Court, that AT&T did anything more than "spin" the Plan transition to make it more palatable for employees. This Court does not find that this rises to the level of active concealment present in Ackerman.

Next, Plaintiffs assert that focus groups of AT&T managers "repeatedly asked AT&T, with no success, for disclosures about whether cash balance 'reduces benefits.'" (Pl. Br. Opp. Summ. J. at 32). In support of this statement, Plaintiffs refer the Court to statements summarizing

---

[26]AT&T does not deny that the transition to cash balance saved them a significant amount of money in administration of its pension plan. This Court, however, is unwilling to construe these savings as evidence of active concealment.

comments made during manager-comprised focus groups assembled in June and September, 1997. (Pl. Stmt. Facts ¶¶ 104; 105). Plaintiffs rely on a power-point slide presentation created in 1997 by the Boston Research Group for AT&T which included a summary of the focus group findings, and provided in relevant part:

> Managers want to see:
> – More detail on "Cash Balance."
> – Comparison of old vs. new.
> – An explanation of 'why' Pension Plan is being changed.
> – More precision in language ("*retirement-related*").

(Exh. 8 to Bosley Report at 20; Pl. App. at 006272) (emphasis original). Significantly, this language was written by the Boston Research Group and does not reflect a direct quotation from an employee of AT&T. Further, this portion of the record does not appear to establish that AT&T actively concealed any benefits or change in benefits from participants. Plaintiffs have provided no legal support for their proposition that a participant's *interpretation* of the Plan's language as confusing, or needing further clarification, constitutes active concealment. Nor does the Court conclude that asking for information during a focus group equates to Plaintiffs' characterization of employees as having "repeatedly asked AT&T, with no success, for disclosures." (Pl. Br. Opp. Summ. J. at 32).

Next, Plaintiffs assert that "[d]eposition testimony and a videotape show that AT&T purposefully avoided comparisons of the plan's old and new benefits because it did not want employees to see the reductions." (Pl. Br. Opp. Summ. J. at 32). After examination of the relevant portions of Plaintiffs' Statement of Material Facts and portions of the record referred to therein, the Court does not conclude that the record establishes that AT&T purposefully avoided

47

the provision of benefit comparisons "because it did not want employees to see the reductions."

(Pl. Br. Opp. Summ. J. at 32). Rather, from the record, it appears to the Court that the primary

reason why AT&T did not provide benefit comparisons was because of the fluidity of its pension

benefit plan calculations. In fact, the videotape which Plaintiffs rely upon to prove their point

instead proves that of Defendants'.[27] In the transcript of a videotaped training session led by Ken

Willetts ("Willets"), an employee of AYCO, a company who was to lead cash balance seminars

for employees, Willetts explains why it makes little sense to provide comparisons to employees.

(Transcript of Videotape; Def. App. at 1903, 43:13- 45:14). Willets states that since each

employee will undoubtedly calculate his or her pension benefit under the old formula based on

existing assumptions regarding the pay base averaging period, they will likely reach the

conclusion that his or her benefit will decrease as a result of the transition to cash balance. (Id.).

However, since this calculation will be based on assumptions which will vary for each

participant, Willetts advises that it does not make sense to provide a general comparison of

benefits for employees. (Id.). This Court does not construe Willett's rationale as evidence that

AT&T actively concealed benefit changes from Plaintiffs. Further, Plaintiffs have not provided

this Court with legal authority for their claim that AT&T was even *required* to provide such a

comparison.

Finally, Plaintiffs claim that "[o]ther documents reveal intentional withholding of

information about conversion factors, the difference between opening balances and the value of

previously-earned benefits, and the relative values of benefit options." (Pl. Br. Opp. Summ. J. at

---

[27]For the purposes of the instant analysis, the Court assumes arguendo, that the tape and
transcript thereof are admissible.

32). This Court has examined the entire record, paying special attention to each portion of the record cited by Plaintiffs, and is unable to determine that the record contains evidence which shows that AT&T intentionally withheld information from the Plaintiffs. To be sure, not every facet of the Plan was described in painstaking detail within the SPD, but such disclosures are not mandated by ERISA nor by the Third Circuit. In fact, Plaintiffs again, do not point to legal authority that supports their claim that AT&T was required to disclose the cash balance conversion factors or differences in the relative values of participants' benefits.

Defendants assert that there is no support for Plaintiffs' allegations of active concealment within the record and that "[t]he SPD fully complied with ERISA and the regulations, containing everything it had to." (Def. Br. Reply at 16). Defendants assert that the alleged omissions from the SPD which form the basis for Claim Six merely evidence Plaintiffs' dissatisfaction with the statutorily-permitted changes which AT&T implemented to the Plan. (Def. Br. Summ. J. at 43). Defendants state that "the omissions or deficiencies to which plaintiffs object could only have affected benefits that they wished AT&T would have continued offering, and not benefits to which they might have been legally entitled." (Def. Br. Summ. J. at 43).

The Third Circuit has not expressly ruled out the possibility of voiding a plan amendment that is the subject of a reporting and disclosure violation, Hozier, 908 F.2d at 1168-69 n. 15. Further, this "remedy is appropriate in situations of active concealment." Ackerman, 55 F.3d at 125 n. 8. But the Ackerman Court also cautioned "that an inference of bad faith or active concealment does not arise simply from a failure to comply with ERISA's reporting or disclosure requirements" and requires analysis of the factual context of the particular case. Id. Here, the Court does not determine that any evidence in the record or offered by the Plaintiffs demonstrates

49

that AT&T actively concealed any change in benefits available under the Plan. Even if Plaintiffs were able to prove a reporting or disclosure-based violation, Plaintiffs are still required to demonstrate extraordinary circumstances in the form of active concealment in order to recover equitable relief. The Court has reviewed the SPD, paying particular attention to the portions relating to the cash balance transition, and finds no indicia that the Defendants intentionally withheld information from the Plaintiffs. Further, Plaintiffs have not shown affirmative acts of fraud, particular vulnerability, or inequitable conduct by Defendants. Kurz, 96 F.3d at 1553. As such, this Court determines that, as a matter of law, Plaintiffs fail to demonstrate the existence of extraordinary circumstances.

Since Plaintiffs are unable to demonstrate the existence of extraordinary circumstances, Plaintiffs' claim for equitable relief based on procedural violations of ERISA must fail. Plaintiffs' motion for summary judgment with respect to Claim Six is hereby denied and the motion of Defendants is granted. Claim Six is hereby dismissed.

## CONCLUSION

For the reasons set forth above, Plaintiffs' motion for summary judgment is DENIED and Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

An appropriate order follows.

DATED: March 30, 2006                           s/ Jose L. Linares
                                        United States District Judge