_____

PHILLIP C. ENGERS, WARREN J.   :   **UNITED STATES DISTRICT**
MCFALL, DONALD G. NOERR, and   :   **COURT FOR THE DISTRICT**
GERALD SMIT, individually and on   :   **OF NEW JERSEY**
behalf of all others similarly situated,   :
  :
                Plaintiffs,   :
    v.   :   Civil Action 98-3660 (SRC)
  :
AT&T, INC., AT&T PENSION BENEFIT   :
PLAN, and AT&T PUERTO RICAN   :
PENSION BENEFIT PLAN,   :
  :
                Defendants.   :
_____   :

## PLAINTIFFS' OPPOSITION TO AT&T'S MOTION
## FOR PARTIAL SUMMARY JUDGMENT OR DECERTIFICATION

Maureen S. Binetti             Stephen R. Bruce
Wilentz, Goldman & Spitzer      Allison C. Pienta
90 Woodbridge Center Dr.       805 15th St., NW, Suite 210
Woodbridge, NJ 07095-0958     Washington, DC 20005
(732) 855-6034                  (202) 371-8013


Jonathan I. Nirenberg           Edgar Pauk
Resnick Nirenberg & Cash, P.C.    27 Eighth Ave.
101 Eisenhower Pkwy, Ste. 300     Brooklyn, NY 11217
Roseland, NJ 07068             (347) 529-4604
(973) 795-1240

                         Attorneys for Plaintiffs

# TABLE OF CONTENTS

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      AT&T Is Not Entitled to Exclude Opt-In Plaintiffs Who Signed the
        VRIP Release Because the Release Contains an Express Reservation
        that It Is "Not Intended to Limit Me ... From Receiving Benefits to
        Which I Am Otherwise Entitled." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     AT&T's Alternative Arguments Against the Opt-In Plaintiffs Who Left
        Under VRIP Are Without Merit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

III.    The Collective Action Definition Should Not Be Revised to Base
        Membership on Turning Age 40 by January 1, 1998; This Court Already
        Ruled and the Court's Ruling Is Correct. . . . . . . . . . . . . . . . . . . . . . . . . . 18

IV.     Opt-In Plaintiffs Who Left AT&T in 2005-2007 Under the Change in
        Control ("CIC") Program Should Not Be Excluded Because the Release
        They Signed Contained an Express Carveout for the *Engers* Litigation. . 23

V.      Opt-In Forms that Were Signed On or Before November 26, 2007 But
        Postmarked Thereafter Should Not Be Excluded Without Review Under
        the "Excusable Neglect" Standard, Including to Assess Any Prejudice
        to AT&T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

# TABLE OF AUTHORITIES

## CASES

*AT&T Corp. v. Hulteen*, 129 S. Ct. 1962 (2009) ........................................ 20

*Abubakar v. County of Solano*, 2008 U.S. Dist. LEXIS 17456, 2008 WL 550117 (E.D. Cal. Feb. 22, 2008) ......................................................... 29

*Amara v. CIGNA*, 534 F. Supp. 2d 288 (D. Conn. 2008), *aff'd*, 2009 WL 3199061 (2d Cir. Oct. 6, 2009) .............................................................. 10

*Baroni v. BellSouth Telecommunications, Inc.*, 2004 WL 1687434, 2004 U.S. Dist. LEXIS 14403 (E.D. La. July 27, 2004) .................................. 1

*Bishop v. AT&T Corp.*, 256 F.R.D. 503 (W.D. Pa. 2009) .......................... 21

*Bixler v. Central Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292 (3d Cir. 1993) ........................................................................ 11

*Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326 (3d Cir. 1995) ... 14

*Camesi v. University of Pittsburgh Medical Ctr.*, 2009 WL 4573287 (W.D. Pa. Dec. 1, 2009) ................................................................ 29

*Camp v. Progressive Corp.*, 2003 U.S. Dist. LEXIS 14094 (E.D. La. Aug. 5, 2003) ........................................................................... 28

*Carter v. AT&T Co.*, 870 F. Supp. 1438 (S.D. Ohio 1994) ......................... 8

*Calvitti v. Anthony & Sylvan Pools Corp.*, 2009 WL 3792393 (3d Cir. Nov. 30, 2009) ........................................................................... 11

*In re Cendant Corp. Prides Litigation*, 189 F.R.D.321 (D.N.J. 1999)    ... 27

*In re Cendant Corp. Prides Litigation*, 233 F.3d 188 (3d Cir. 2000) ......... 27

*Cirillo v. Arco Chemical Co.*, 862 F.2d 448 (3d Cir. 1998) ......................... 4

*Cole v. Gaming Entertainment*, 199 F. Supp. 2d 208 (D.Del. 2002) .......... 13

*Dasilva v. Esmor Correctional Servs., Inc.*, 167 Fed. Appx. 303, 2006
    WL 197610 (3d Cir. 2006) .................................................................... 27

*In re Diet Drug Prods. Liability Litig.*, 92 Fed.Appx. 890 (3d Cir. 2004) .. 29

*EEOC v. Renhill Group, Inc.*, 2009 WL 1605159 (N.D. Ind. June 5, 2009) 29

*Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165 (1989) ......................... 21

*Jakimas v. Hoffman-La Roche, Inc.*, 485 F.3d 770 (3d Cir. 2007) ......... 2, 15

*Kelley v. Alamo*, 964 F.2d 747 (8th Cir. 1992) .......................................... 27

*Kuhn v. Philadelphia Electric Co.*, 475 F. Supp. 324 (E.D. Pa. 1979) ....... 29

*Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43 (3d Cir. 1989),
    *overruled  on other grounds, Starceski v. Westinghouse Elec. Corp.*,
    54 F.3d 1089 (3d Cir. 1995) .................................................................. 21

*Lockheed Corp. v. Spink*, 517 U.S. 882 (1996) .......................................... 20

*Long v. Sears Roebuck and Co.*, 1996 U.S. Dist. LEXIS 2490
    (E.D.Pa. 1996) ........................................................................................ 4

*Mascol v. E&L Transport, Inc.*, 2005 U.S. Dist. LEXIS 32634 (E.D.N.Y.
    June 30, 2005) ........................................................................................ 29

*Mikula v. Allegheny County of PA*, 583 F.3d 181 (3d Cir. 2009) .............. 20

*Monroe v. United Air Lines, Inc.*, 94 F.R.D. 304 (N.D. Ill. 1982) ............. 28

*Moya v. Pilgrim's Pride Corp.*, 2006 U.S. Dist. LEXIS 87150 (E.D. Pa.
    Nov. 30, 2006) ........................................................................................ 29

*Oglesby v. Coca-Cola Bottling Co.*, 620 F. Supp. 1336 (N.D.Ill. 1985) .... 13

*Perry v. Beneficial Finance Co.*, 88 F.R.D. 221 (W.D.N.Y. 1980) ............ 30

*Riddell v. Medical Inter-Insurance Exch.*, 18 F. Supp. 2d 468
　　(D.N.J. 1998) ...................................................................................... 13

*Robinson-Smith v. Government Employees Insurance Co.*, 424 F. Supp.
　　2d 117 (D.D.C. 2006) ......................................................................... 28

*Romero v. Allstate Corp.*, 2009 U.S. App. LEXIS 16671 (3d Cir.
　　July 29, 2009) ..................................................................................... 10

*Ruehl v. Viacom, Inc.*, 500 F.3d 375 (3d Cir. 2007) .................................. 21

*Ruggles v. Wellpoint, Inc.*, 2009 U.S. Dist. LEXIS 99548 (N.D.N.Y.
　　Oct. 4, 2009) ....................................................................................... 27

*Schengrund v. Pennsylvania State University*, 2009 WL 3182490 (M.D.
　　Pa. Sept. 30, 2009) .............................................................................. 20

*In re Schering-Plough Corp. ERISA Litigation*, 589 F.3d 585 (3d Cir.
　　Dec. 21, 2009) ..................................................................................... 15

*Sperling v. Hoffman-La Roche, Inc.*, 118 F.R.D. 392 (D.N.J. 1988) .......... 21

*Syverson v. IBM*, 472 F.3d 1072 (9th Cir. 2007) ...................................... 11

*Thomforde v. IBM*, 406 F.3d 500 (8th Cir. 2005) ...................................... 10

*Tomlinson v. El Paso Corp.*, 2009 WL 2766718 (D. Colo. Aug. 28, 2009)  20

*United States v. Busic*, 587 F.2d 577 (3d Cir. 1978) .................................. 14

*United States v. Sensient Colors, Inc.*, 580 F. Supp. 2d 369 (D.N.J. 2008) ..  3

*Wastak v. Lehigh Valley Health Network*, 342 F.3d 281 (3d Cir. 2003) .......  4

iv

## STATUTES, REGULATIONS AND RULES

ADEA §7(b), 29 U.S.C. § 626(b) ................................................................ 26

ADEA §7(d), 29 U.S.C. §626(d) ................................................................ 20

ADEA §7(f)(1)(A), 29 U.S.C. §626(f)(1)(A) .............................................. 11

ADEA §7(f)(3), 29 U.S.C. §626(f)(3) .......................................................... 4

ERISA §102(a), 29 U.S.C. §1032(a) ............................................................ 7

ERISA §205, 29 U.S.C. §1055 .................................................................... 30

Lilly Ledbetter Fair Pay Act, P.L. 111-2 .................................................... 20

29 C.F.R. 1625.22(b) ............................................................................. 11-12

29 C.F.R. 2520.102-3(l) ............................................................................... 8

29 C.F.R. 2520.104b-3(a) ............................................................................ 7

F.R.C.P. 21 ............................................................................................ 28-29

F.R.C.P. 42(a) ........................................................................................ 28-29

**Introduction**

*Baroni v. BellSouth Telecommunications, Inc.*, 2004 WL 1687434, *12,

2004 U.S. Dist. LEXIS 14403, *50 (E.D. La. July 27, 2004), recognizes that

"sending notices to all of the putative class members [is] not an inexpensive

endeavor." *Baroni* concerned a case with only 60 class members, not over 41,000

as here. Plaintiffs' counsel have paid over $282,000 to distribute notices, maintain

a call center, and process responses. The results of that effort are extraordinary.

Almost 24,000 people opted in, making this the largest collective action in U.S.

history.

Now, AT&T seeks to carve out large swaths of those opt-ins – 6,967

persons whose employment was terminated under a 1998 Voluntary Retirement

Incentive Program ("VRIP"); 4,050 persons who were not age 40 as of January 1,

1998; and 815 persons whose employment was terminated in 2005-2007 under

Change-in-Control ("CIC") provisions after SBC's acquisition of AT&T. Failing

that, AT&T seeks to whittle away at 182 opt-in plaintiffs because their consent

forms were postmarked by the U.S. Postal Service one or five days after the forms

were signed. None of those positions are legally correct or properly supported.[1]

---

 [1]  The Exhibits referenced below include Exhibits submitted with Plaintiffs'
motion for partial summary judgment on the Fourth, Fifth, Tenth and Twelfth
Claims for Relief under ERISA. Plaintiffs have numbered their Exhibits related to

1

I.    **AT&T Is Not Entitled to Exclude Opt-In Plaintiffs Who Signed the VRIP Release Because the Release Contains an Express Reservation that It Is "Not Intended to Limit Me ... From Receiving Benefits to Which I Am Otherwise Entitled."**

Because "Congress recognized [that] 'the continued well-being and security of millions of employees and their dependents are directly affected by [pension] plans'" and "pensions are major assets for most Americans," "[a] plaintiff should not be deterred from bringing a meritorious lawsuit." *Jakimas v. Hoffman-La Roche, Inc.*, 485 F.3d 770, 784 (3d Cir. 2007). Before a release of rights to pension benefits can block an individual's action, the defendant must establish that the release was "made knowingly and voluntarily," with a "totality of the circumstances test" used to determine validity. *Id.* at 781 (citing *Coventry v. U.S. Steel Corp.*, 856 F.2d 514, 522-23 (3d Cir. 1988)). A release is "an affirmative defense," the burden of which is on the party seeking summary judgment, to prove that no genuine issues of material fact exist." *Id.* at 782.

At the outset, AT&T's current motion suffers from a fatal flaw: AT&T never pled releases as an affirmative defense. On May 9, 2000, Judge Politan found that AT&T was soliciting releases from class members as part of "force management" programs while this lawsuit was pending. Judge Politan issued a

all of the dispositive motions under consideration consecutively to avoid repetition and have one set of Exhibits.

preliminary injunction from the bench against that practice on the ground that AT&T needed to tell members of the class that they were giving up rights in a proposed class action and could not communicate with them about their rights except through counsel. In response to Judge Politan's ruling, AT&T agreed to nullify any releases signed after the date this lawsuit was filed. See 5/9/2000 Minute entry (dkt.#56) and May 9, 2000 transcript. Thereafter, perhaps chastened by Judge Politan's ruling, AT&T never pled releases as an affirmative defense either to the ADEA or the ERISA claims. Although AT&T pled sixteen affirmative defenses, no affirmative defense was included based on releases. See Dkt. #326 (filed April 13, 2007). AT&T did put in a catch-all "seventeenth" affirmative defense to "reserve the right to assert any and all additional affirmative defenses as to the claims of any additional Plan participants who may be joined as parties if plaintiffs are permitted to bring their ADEA claims as an ADEA collective action." But AT&T never described what those affirmative defenses were and never exercised its right to assert them by seeking to amend its Answer. *United States v. Sensient Colors, Inc.*, 580 F.Supp. 2d 369, 389 (D.N.J. 2008), holds that a "general reservation" defense like this is insufficient because it "injects only ambiguity into the pleadings and therefore violates Rule 8's notice requirement."

Even if the defect in pleading is not dispositive, AT&T's motion for summary judgment fails because the release of rights to bring benefit claims was not "knowing and voluntary." Whether a release of rights is "knowing and voluntary" is a question of fact for the jury, *Long v. Sears Roebuck and Co.*, 1996 U.S. Dist. LEXIS 2490, *15 (E.D.Pa. 1996), on which the defendant bears the burden of proof. See 29 U.S.C. §626(f)(3). AT&T correctly cites *Cirillo v. Arco Chem. Co.*, 862 F.2d 448, 451 (3d Cir. 1998), on the "knowing and voluntary" standard,[2] but AT&T avoids the four factors in *Cirillo* that weigh against its position with superficial arguments and inaccurate or incomplete facts. See Br. at 21-23. In relevant part, *Cirillo* instructs the district court to consider:

    (1)    The "clarity and specificity" of the release;

    (2)    The "opportunity for negotiation" of the terms;

    (3)    Whether the employee "should have known his rights upon execution";

    (4)    Whether the consideration exceeds the benefits to which the employee was already entitled "by contract <u>or law</u>."

*Id*. at 451 (emph. added). Considering these factors, this Court should <u>not</u> exclude

---

[2] *Wastak v. Lehigh Valley Health Network*, 342 F.3d 281, 295 n.8 (3d Cir. 2003), holds that the OWBPA only sets "minimum" requirements and that a release must also be "knowing and voluntary" under the totality of the circumstances approach in *Cirillo*.

close to 7,000 opt-ins whose employment was terminated under the Voluntary

Retirement Incentive Program ("VRIP") either on summary judgment or at trial.

Most critically, AT&T has failed to mention, much less address, that the Release

expressly provides in Paragraph 4 that:

> This Release is not intended to limit me from instituting legal action
> for the sole purpose of enforcing this Release or, except as provided
> in Paragraph 12, from receiving benefits to which I am otherwise
> entitled prior to the effective date of this Release.

Ex. 92; Pls. Addit. Facts ¶ 21. The reference to "Paragraph 12" only limits the

right to receive sickness and accident disability benefits, and thus is not a relevant

limitation. The first sentence of the General Release for the VRIP further affirms

this reservation by stating that the VRIP benefits "are in addition to any benefits to

which I was entitled prior to the AT&T Board of Directors' adoption of this

program." *Id.* AT&T also fails to mention that there is a penalty for violating the

terms of the Release of $25,000 plus payment of attorneys' fees. *Id.* at ATTENG

040590.

Besides the four-page Release itself, the only other mention of releases in a

written communication to employees was a short section entitled "VRIP Release"

on page 2 of a "VRIP Benefits Guide." That material said nothing about releasing

claims to benefits to which employees were entitled. Instead, it stated that the

5

Release covered "claims (including lawsuits) against the Company and certain other parties for reasons related to your employment or termination of employment." Ex. 89 at ATTENG 040531; Pls. Addit. Facts ¶ 24. It further stated the "The Release also asks you to agree to other terms and conditions related to termination, including waiving sickness and accident disability and/or long-term disability benefits." *Id*. The Guide said nothing about waiving retirement benefits.

Beginning at the end of January 1998, there were at least two audiotaped or videotaped meetings with employees about the VRIP as well as seminars and other written material. Pls. Addit. Facts ¶¶ 30-32. None of the written communications with employees, including the Q&A's, stated or indicated that the reservation for benefits to which employees were entitled was intended to have a limited meaning that would not cover claims for benefits under ERISA or the ADEA, or that penalties could be incurred for joining in such claims. *Id*. at ¶¶ 24-27. AT&T has produced a transcript of a January 26, 1998 meeting with employees which contains no discussion about releases. *Id*. at ¶ 30. AT&T has not produced the audiotapes, videotapes, or transcripts of other meetings with employees, including a March 11, 1998 town meeting with AT&T's CEO, C. Michael Armstrong. AT&T says that it cannot find the transcript or tapes of the March 11, 1998 town meeting, even though it acknowledges that the meeting occurred and was

6

recorded. *Id*. at ¶ 31. AT&T makes no claim that any oral communication in that or any other meeting ever said that AT&T intended for the Release to cover benefit claims under ERISA or the ADEA. Internal emails produced by a member of the collective action show that AT&T personnel with benefits responsibilities were told to tell employees that no alterations or deviations would be permitted and were given no material to clarify the intent of the releases in oral communications. They were told to simply demand that the Release be signed with no changes. *Id*. at ¶ 28.

Because the VRIP was a material change to the terms of the Plan incorporated in Appendix I to the Plan document (Ex. 5 at 144), ERISA required a summary of material modification ("SMM") to be provided to participants "written in a manner calculated to be understood by the average plan participant." ERISA §102(a); 29 C.F.R. 2520.104b-3(a). However, AT&T never prepared any summary that addressed: (a) the scope of the release, (b) AT&T's intent "not to limit" employees from receiving any benefits to which they are otherwise entitled, or (c) the penalties that could be exacted for violating the release. The Department of Labor's regulations for SPDs and SMMs requires a "statement clearly identifying circumstances which may result in disqualification, ineligibility, or denial, loss [or] forfeiture" of benefits that a participant may reasonably expect to

7

receive on the basis of the affirmative description of benefits. 29 C.F.R. 2520.102-3(l). Here, there was never a statement provided to participants "clearly identifying" that they could lose or forfeit VRIP benefits, and incur penalties from joining a collective action in order to receive the benefits to which they were otherwise entitled. If AT&T's position about the Release were accepted, a participant could not only lose or forfeit the VRIP benefits but be forced to pay a $25,000 penalty and attorneys' fees because the reservation for benefits to which they are entitled covers less than appears on its face.

AT&T also never mentioned that a classwide EEOC charge about discrimination in retirement benefits had already been filed by named Plaintiff Gerald Smit on January 15, 1998. Pls. Addit. Facts ¶ 29. AT&T never expressed an intent to include that charge under paragraph three of the Release or to exclude it from the reservation for benefits in paragraph four. AT&T has not produced a single internal memo evidencing any such intent and has not even filed a declaration in support of its motion attesting to such an intent.

In *Carter v. AT&T Co.*, 870 F.Supp. 1438, 1441-42 (S.D. Ohio 1994), Jacquelyn Carter claimed that her years of service with AT&T were calculated in violation of the Pregnancy Discrimination Act, which amended Title VII. AT&T moved for summary judgment on the ground that the plaintiff's claim should be

barred because she had signed an all-inclusive release as part of a early retirement incentive plan. But the district court found that the release contained a provision which said "I understand that this Termination Agreement and Release in no way affects any rights I may have for benefits under the AT&T Management Pension Plan or any other applicable AT&T benefit plan." The court held that this "specifically reserves the employee's rights for benefit claims under the pension plan." The court ruled that the plaintiff's claim for additional years of service under Title VII was "exactly the exception that was provided for in the release."

The *Carter v. AT&T* case was settled on appeal without vacating or otherwise modifying the district court's decision. Pls. Addit Facts ¶ 23. As a result, AT&T's intent in 1998 and other years should be presumed to be acceptance of the district court's 1994 ruling. Even if that inference is not drawn, AT&T was certainly on notice from the *Carter* decision that its reservation for benefits could be interpreted in this manner and that a release of rights to benefits under the ADEA or ERISA might <u>not</u> be considered "knowing" because of that language. If AT&T wanted to achieve a different result, it had four years to revise the reservation for benefit claims to make a different intention clear. But AT&T did not do so either in the language of the VRIP release or any written or oral communication with its employees.

9

A similar exception for "any claims for benefits under any retirement programs" was found in *Amara v. CIGNA*, 534 F.Supp.2d 288, 314-16 (D. Conn. 2008), aff'd, 2009 WL 3199061 (2d Cir. Oct. 6, 2009). There, the District Court determined that when waivers have barred ERISA claims, "the language of the waiver was all-inclusive and unambiguous." The Court found:

> no indication that either party, much less both, intended to draw the kind of fine distinctions CIGNA now argues the Court should read into the exception. CIGNA points to no language, either in the waivers themselves or in the SPD for the Severance Pay Plan, that suggests, let alone explicitly states, that the exception covers only claims for benefits under the terms of the Plan, and not claims under ERISA itself.

534 F.Supp.2d at 316.[3]

At a minimum, the language of AT&T's release is "confusing," i.e., it sends out mixed signals that a participant could not understand even with the assistance of a lawyer. In *Thomforde v. IBM*, 406 F.3d 500, 504-5 (8th Cir. 2005), the Eighth

---

[3] A similar exception in *Romero v. Allstate Corp.*, 2009 U.S. App. LEXIS 16671, *15-16 (3d Cir. July 29, 2009), covered "any benefits to which I am entitled in accordance with any Allstate plan subject to ERISA by virtue of my employment with Allstate prior to my employment termination date." *Romero* sent the case back (and assigned it to a different judge) because the district court had not allowed the plaintiffs to take adequate discovery into the facts concerning the signing of the releases and the district court's two-page order made review "nearly impossible." The Third Circuit nevertheless focused on the exception and ruled: "[I]f the release is valid, the District Court must consider on remand whether the claims in Counts I and III of *Romero II* are claims for benefits to which the plaintiffs were entitled in accordance with any Allstate ERISA plan." *Id.* at *22.

Circuit held that "It seems axiomatic that if an agreement needs clarification" from a "corporate attorney," "it is not written in a manner calculated to be understood." *Thomforde* concluded that the release was invalid because of the violation of ADEA §7(f)(1)(A), 29 U.S.C. 626(f)(1)(A), as amended by the OWBPA, and 29 C.F.R. 1625.22(b)(3). Accord *Syverson v. IBM*, 472 F.3d 1072, 1083 and 1086 (9th Cir. 2007) ("confusing" language in waiver and violated the "manner calculated" requirement in the OWBPA).[4]

Finally, in light of the ambiguity and confusion in the release, the violation of the Department of Labor's and the EEOC's disclosure requirements, and Mr. Smit's then-pending classwide ADEA charge, AT&T had a fiduciary duty of disclosure, under Third Circuit case law, if it intended to bar individuals from joining Mr. Smit's ADEA charge. See *Bixler v. Central Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3d Cir. 1993) (failing to provide "complete and accurate information material to the beneficiary's circumstances" is breach of fiduciary duty).

---

[4] See also *Calvitti v. Anthony & Sylvan Pools Corp.*, 2009 WL 3792393, *2 (3d Cir. Nov. 30, 2009) (not precedential) ("[w]hether an agreement is ambiguous is a question of law for the court to decide after considering whether, from an objective standpoint, the agreement is reasonably susceptible to at least two different interpretations," citing *McDowell v. Phila. Housing Auth.*, 423 F.3d 233, 238 (3d Cir. 2005)).

Thus, looking at the factors in *Cirillo*, AT&T's release was not "knowing and voluntary" because:

(1)  Given the reservation for benefit claims, the release language was neither clear nor specific and it was not in compliance with 29 C.F.R. 1625.22(b)(1), (3) or (4).

(2)  There were no opportunities for negotiation of the terms of the Agreement. AT&T concedes that there was no such opportunity and the email strings that a member of the collective action produced confirm that. Pls. Addit. Facts ¶ 28.

(3)  Upon execution of the release, a participant would not have known his or her rights insofar as benefit claims or would have believed that they were preserved. A participant would not have understood that he or she was foregoing any right to join in a lawsuit about the benefits to which they were entitled by law, e.g., that the periods of wear-away discriminated on the basis of age.

(4)  The consideration did not exceed the benefits to which the employee already was entitled "by contract or law" because the "law" was not followed in determining the benefits to which employees were entitled.

AT&T argues that the absence of any opportunity to negotiate is not dispositive because the conditions surrounding execution of the releases were not "oppressive." See Br. at 22-23. But the conditions were oppressive because participants were required to sign a confusing release under the threat of involuntary terminations if enough of them did not "volunteer" (Pls. R. 56.1 Resp. ¶ 3), with no ability to alter the release and no information about AT&T's intent.

12

See *Cole v. Gaming Entertainment*, 199 F.Supp.2d 208, 214-15 (D.Del. 2002) (release invalid where language was "boilerplate" and there were "no facts to indicate that Cole ever suggested that the terms of the release could be modified"); *Riddell v. Medical Inter-Insurance Exch.*, 18 F.Supp.2d 468, 473-74 (D.N.J. 1998) ("The ability to negotiate suggests that the atmosphere surrounding the signing of the release was not oppressive and thus indicates a voluntary waiver").

In sum, here as in *Carter* and *Amara*, the *Engers* lawsuit is about additional benefits to which people were entitled under the law prior to the release. But AT&T's motion not only fails to mention the reservation for benefits in its release, it also has not mentioned the cognate *Carter v. AT&T* decision. See Br. at 7. On summary judgment and at trial, AT&T bears the burden of establishing facts related to the releases to support its affirmative defense. AT&T clearly cannot shoulder its burden when it does not address the exception in its release or relevant legal authority, much less proffer evidence of its intent with respect to that exception and its communication of that intent to the employees who signed the releases.

The absence of any evidence or witnesses on the intent of the release or the reservation for benefits also precludes summary judgment. See *Oglesby v. Coca-Cola Bottling Co.*, 620 F.Supp. 1336, 1343 (N.D.Ill. 1985) ("the ambiguities

inherent in the language and factual context of the Release preclude any ruling as a matter of law as to the Release's intended coverage.  Under the circumstances the question of contractual intent must be for the trier of fact").[5]

## II.   AT&T's Alternative Arguments Against the Opt-In Plaintiffs Who Left Under VRIP Are Without Merit.

AT&T offers two additional arguments directed against the close to 7,000 opt-in plaintiffs who left AT&T under the VRIP:

First, AT&T incongruously contends that even if the VRIP releases were not "knowing and voluntary" under the ADEA, the releases might still be valid for ERISA claims. Br. at 25-26. However, the reservation for benefits to which a participant is entitled in paragraph four of the Release should cover benefits to which a participant is entitled under both ERISA and the ADEA. *Jakimas* (which AT&T cites) supports plaintiffs, by holding that the "knowing and voluntary"

---

[5]  The absence of any evidence of AT&T's intent would also give rise to an adverse inference at trial from the failure to produce. See *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 334 (3d Cir. 1995) ("When the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party that has prevented production did so out of the well-founded fear that the contents would harm him"); *United States v. Busic*, 587 F.2d 577, 586 (3d Cir. 1978) ("basis of the 'missing witness' inference is that, where a party fails to call an available witness whose testimony could be expected to favor him, a natural inference arises that that witness would have exposed facts unfavorable to that party").

14

standard applies to the release of ERISA claims. 485 F.3d at 781.[6] AT&T's failure

to plead any affirmative defense based on releases would also apply to the ERISA

claims.

Here, moreover, the ERISA class in this case was certified by Judge Politan

in November 2001 under Rule 23(b)(2). There was no opt-in or opt-out provision

in that certification. See 11/20/2001 Order (dkt. #102). Thus, the VRIP opt-ins

have only elected to "join" an ADEA collective action. They did not have to do

anything to be a member of the ERISA class, nor were they given a right to opt-

out. Thus, in addition to the reservation for benefit to which participants were

already entitled under paragraph four of the release, the terms of paragraph three

of AT&T's release do not bar these employees from being members of the ERISA

class.

Second, AT&T argues that the employees who were terminated under VRIP

were not victims of age discrimination because they received "substantially greater

---

[6] *In re Schering-Plough Corp. ERISA Litig.*, 589 F.3d 585, 594 (3d Cir. Dec. 21, 2009), the Third Circuit found, moreover, that "[t]he vast majority of courts have held that an individual release has no effect on an individual's ability to bring a claim on behalf of an ERISA plan under § 502(a)(2)"; indeed, there appears to be only one [district court] case to have so concluded." *Schering-Plough* only remanded to the district court to consider typicality and adequacy because the named plaintiffs had signed individual releases. In this case, none of the four named Plaintiffs signed releases.

benefits than those authorized by the 1997 Plan amendment." Br. at 24. AT&T

first frames this as though it were a motion for partial summary judgment, Br. at

24-25, and later frames it as though it means that they are not "similarly situated"

to the other members of the collective action. Br. at 34. AT&T supports this

assertion with two plainly incorrect statements:

(A) "This [wear-away] calculation has no relevance to the VRIP plaintiffs.

Their benefits were calculated based on a separate subsequent amendment to the

Plan, not on the basis of the Special Update or cash balance formulas." Br. at 25.

This assertion is not made or supported by AT&T's Rule 56.1 Statement. In fact,

the benefits of the VRIP plaintiffs were calculated on the basis of the Special

Update or cash balance formulas, with an enhancement added as an incentive to

leave AT&T (hence, the name Voluntary Retirement Incentive Program). Ex. 5 at

Appendix I, §1.04. As stated, the first sentence of the VRIP release says that the

VRIP benefits are "in addition to any benefits to which I was entitled prior to the

AT&T Board of Directors' adoption of this program." DAII-684. This is further

shown by the worksheet for calculating the VRIP benefits, which shows that the

benefits to which participants are entitled under the Special Update or cash

balance formulas are calculated first. Ex. 1 (Poulin Rpt), Ex. M. Plaintiffs' First

and Second Claims are that those benefits were calculated on a discriminatory

16

basis. Indeed, the evidence shows that AT&T sought to use the bleak prospect of earning no additional benefits during lengthy periods of wear-away as a way to induce the older employees to leave AT&T with only "modest incentives." A "Confidential" memo to the Executive Vice President of Human Resources dated December 1, 1997 states that "retirement eligible" employees or employees "within 5 years of eligibility" "will have Cash Balance Accounts which are lower than the value of their "Special Update" transition benefit" and that "[h]igh rates of election to retire with modest incentives should be expected especially considering the fact that it will take some time for the cash balance benefit to overtake the "Special Update" transition benefit." Pls. Addit. Facts ¶ 45. Thus, AT&T was engaged in a classic carrot and stick approach to move older workers off the employment rolls. The stick or sticks were the prospect of a wear-away extending past age 55 and involuntary terminations if they did not "volunteer" (see Pls. R. 56.1 Resp. ¶ 3), and the carrot was the VRIP benefits. The taped statements of AT&T's former CEO at an April 2001 employee town meeting and his January 2009 deposition testimony were clear that his focus was on cutting payroll. He did not want employees in their late 40's or 50's to see "retention" incentives under the cash balance plan that would encourage them to stay. Pls. Addit. Facts ¶ 47.

(B) AT&T asserts that "there is no 'statistical proof' that the VRIP plaintiffs

are victims of age discrimination." Br. at 25. Again, this statement is not made or

supported by AT&T's Rule 56.1 Statement. In fact, the statistical proof of age

discrimination is the same for the VRIP plaintiffs as for the other members of the

collective action. Their claims of age discrimination are based on the same

practice of using a wear-away design that prevents older, longer-service

employees from earning additional benefits. Their liability and damage

calculations have been performed by Plaintiffs' experts using the same formulas

that apply to all other members of the class. Pls. Addit. Facts ¶ 52. Thus, their

claims of discrimination and the calculations of their damages are not unique.

**III.   The Collective Action Definition Should Not Be Revised to Base Membership on Turning Age 40 by January 1, 1998; This Court Already Ruled and the Court's Ruling Is Correct.**

The November 19, 2001 date in the definition of the ADEA collective

action is an outgrowth of the definition of the ERISA that Judge Politan certified

over eight years ago. That definition included participants who were "currently

age 40" as of the November 19, 2001 date when Judge Politan certified the class.

AT&T has already sought to change that definition once. Opp. to Mot. for

Conditional Approval (dkt. #328) at 6-8. This Court considered AT&T's argument

and, as discussed below, explained why it was not accepting it.

It is too late for AT&T to make a request for this Court to reconsider the

18

scope of the ADEA collective action. This District has repeatedly ruled, including in this litigation, that reconsideration is "an extraordinary remedy that is to be granted very sparingly." See, e.g., 2006 U.S. Dist. LEXIS 85117, *4 (D.N.J. 2006) (Linares). It goes without saying that reconsideration is not a turnstile that only one party can pass through.

AT&T contends that this Court made a "provisional ruling that rested on an application of a 'lenient standard.'" Br. at 28. But this misreads the Court's decision, which does not limit its ruling on the "age 40 cut-off date" in that or any other way. May 24, 2007 Slip Op. (dkt. #335) at 3-5.

Even if the Court were to reconsider, it should not reverse its May 24, 2007 decision to include persons in the collective action who were age 40 by November 19, 2001, or who were age 40 or over on the date when their employment with AT&T ended.  This Court has ruled that:

> Defendants err in treating the effective date of an employment policy as the trigger for discrimination claims under a disparate impact theory.... The operative event is not the creation of the policy but its use to discriminate against an individual. Thus, for example, if a police department establishes a policy requiring all officer applicants to be able to lift weights of 100 pounds, effective January 1, 2000 and continuing thereafter, ... disparate impact claims are not limited to people who had applied as of January 1, 2000, but are available to those who apply thereafter and suffer from the later use of that policy to discriminate against them.... The relevant date is the date of the discriminatory effect on the employee, not of the discriminatory intent

19

> of the employer.... Restricting the class to plaintiffs eligible for
> protection under the ADEA on the plan effective date runs contrary to
> this principle.

May 24, 2007 Slip Op. (dkt. #335) at 3-5. Not only is AT&T's request to

reconsider this ruling untimely and improper, but this Court's analysis is entirely

correct. The Court's analysis was confirmed by the January 29, 2009 enactment of

the Lilly Ledbetter Fair Pay Act, P.L. 111-2. The Ledbetter Act, which applies to

all claims pending on or after May 28, 2007, provides that an unlawful practice

occurs "when a person is affected by application of a discriminatory compensation

decision or practice, including each time wages, benefits, or other compensation is

paid." P.L. 111-2, §4, amending 29 U.S.C. §626(d). The Ledbetter Act's

application to pension benefits was further confirmed by *Tomlinson v. El Paso

Corp.*, 2009 WL 2766718, *4 (D. Colo. Aug. 28, 2009). Cf. *Mikula v. Allegheny

County of PA*, 583 F.3d 181, 186 (3d Cir. 2009); *Schengrund v. Pennsylvania

State University*, 2009 WL 3182490, *6 (M.D. Pa. Sept. 30, 2009).[7]

    The standard for decertification of part or all of a collective action further

---

[7]  AT&T miscites *AT&T Corp. v. Hulteen*, 129 S.Ct. 1962 (2009), and *Lockheed
Corp. v. Spink*, 517 U.S. 882 (1996), as though Plaintiffs are seeking to apply
substantive provisions of the ADEA retroactively by including these persons in the
collective action. See Br. at 30. The ADEA was enacted in 1967, the amendments
adding ADEA §4(i) were enacted in 1986, and the amendments to §§4(f)(2) and
11(l) were enacted in 1990. All of those dates are years before the events in this
case.

shows that the Court's analysis is correct. The standard for decertification is that

employees are not "similarly situated." Whether members of a collective action are

"similarly situated" is determined by a balancing test that reviews three factors,

namely, whether they:

    (1)    Were employed in similar positions,

    (2)    Have similar claims of age discrimination,

    (3)    Seek substantially the same form of relief.

See *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 389 (3d Cir. 2007); *Lockhart v.

Westinghouse Credit Corp.*, 879 F.2d 43, 51-52 (3d Cir. 1989), overruled on other

grounds, *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1099 n.10 (3d Cir.

1995). See also *Bishop v. AT&T Corp.*, 256 FRD 503, 508 (W.D. Pa. 2009).

    This balancing test is performed in light of the purpose of collective actions,

i.e.: "The judicial system benefits by efficient resolution in one proceeding of

common issues of law and fact arising from the same alleged discriminatory

activity." *Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989). The

focus of these factors is whether the employees were impacted by a common

policy. *Sperling v. Hoffman-La Roche, Inc.*, 118 FRD 392, 405 (D.N.J. 1988).

    Applying these factors, all of the persons AT&T seeks to exclude were in

managerial positions covered by the AT&TMPP. Their claims of age

discrimination are based on the practice of using a wear-away design that prevents older, longer-service employees from earning additional benefits. Liability and damage calculations for them have been performed by Plaintiffs' experts using the same formulas that apply to all other members of the class. Pls. Addit. Facts ¶ 52. Their claims of discrimination and the calculations of their damages are not unique.

AT&T has, by contrast, not described or applied any of these factors, much less shown that it is entitled to decertification under this balancing test. Furthermore, AT&T has not pled any unique defense against this group of employees, nor does it argue in its main motion against liability on any grounds unique to them.

AT&T offers some new observations about approximately <u>one-fourth</u> of this group of 4,050 persons. According to one declaration, 754 of them were less than age 40 when their employment ended. Def. R. 56.1 ¶ 26. According to a declaration from a different person, 568 of them were not age 40 at the time their period of wear-away ended. Def. R. 56.1 ¶ 29. Significantly, however, AT&T does not make any alternative arguments to exclude only these segments of the group of

4,050 who were not age 40 on January 1, 1998.[8] Moreover, in making these observations, AT&T overlooks the fact that the periods of actual wear-away necessarily end when a person's employment ends. Both parties' experts agree that the period of potential wear-away is the more "meaningful measure" because this indicates how long the practice would have lasted and is not "affected by behavioral responses to [the] changes in the benefit plan," such as leaving AT&T or accepting a voluntary incentive offer due to the changes. Pls. R. 56.1 Resp. ¶ 29.

## IV.   Opt-In Plaintiffs Who Left AT&T in 2005-2007 Under the Change in Control ("CIC") Program Should Not Be Excluded Because Their Releases Contained an Express Carveout for the *Engers* Litigation.

AT&T's argument concerning 815 opt-in plaintiffs who received benefits under the Change in Control ("CIC") provisions from November 2005 to November 2007 comes out of the blue and is incredibly confusing. Nothing like this was pled as an affirmative defense, identified in AT&T's Rule 26(a) disclosures, or discussed in AT&T's expert reports. The facts that AT&T offers in support are limited to one paragraph on pages 9-10 and one paragraph on page 36.

Moreover, although its Appendix runs eight volumes, AT&T does not

---

[8]  AT&T has also not relied on any of these arguments in its principal summary judgment motion as a basis for ruling that there was no age discrimination.

include the releases these persons signed. However, in compliance with the
preliminary injunction Judge Politan issued from the bench on May 9, 2000, the
releases that these persons signed contained an express carveout for the *Engers*
litigation:

> Nothing in this Termination Agreement and Release limits my right to
> participate and recover damages or other relief in a case known as
> "Engers, et al. v. AT&T and AT&T Management Pension Plan," Civil
> Action No. 98-CV-3660 (NHP), which alleges ADEA and ERISA
> violations in AT&T's cash balance pension program for management
> employees and is currently pending before the United States District
> Court for the District of New Jersey.

Ex. 96. In a July 28, 2008 email, Defendants' counsel confirmed that:

> Legacy AT&T management employees who involuntarily left with an
> off-payroll date between November 18, 2005 and November 17, 2007
> received the CIC benefits and received the ASP release, which
> includes the Engers carveout within the body of the release.

Ex. 97. There have been a number of other force management programs in
addition to the CIC since Judge Politan issued the preliminary injunction, all of
which, according to Defendants' counsel, have contained the "carveout" for the
*Engers* litigation. *Id.*

 As with the arguments against the VRIP opt-ins, AT&T alternatively argues
that these individuals received "significantly higher benefits" under the CIC
provisions. Br. at 36. This is true of everyone whose employment with AT&T was

terminated under a force management program. In each case, additional benefits were offered as compensation for the force reduction or the change in control, and the releases expressly preserve rights to seek redress in the *Engers* case for age-discriminatory practices in the calculation and payment of the pension benefits to which they were already entitled. It is unclear how AT&T can argue that the benefits provided under the CIC provisions constitute consideration for claims that were specifically <u>not</u> released.

## V.    Opt-In Forms that Were Signed On or Before November 26, 2007 But Postmarked Thereafter Should Not Be Excluded Without Review Under the "Excusable Neglect" Standard, Including to Assess Any Prejudice to AT&T.

AT&T asks to exclude 182 opt-in forms that it contends were:

(a) postmarked "late" (166),

(b) "unsigned or signed by a person without authority" (8), or

(c) "do not meet the eligibility criteria established by the Court because they were not participants in the Plan on the relevant dates as set forth in the certification order" (8).

Br. at 37. In challenging these individuals' status as plaintiffs, AT&T fails to cite the relevant case law, including in the Third Circuit, which shows that tardy or incomplete opt-ins are permitted within the equitable discretion of the District Court.

One hundred and eighty-two (182) opt-ins out of 23,938 is a remarkably low number. In percentage terms, this is about three-quarters of one percent (.0075). It is a reflection of how well this very large noticing process was handled by Complete Claims Solutions, the class action administrator retained by Plaintiffs' counsel, and how well current and former AT&T managers responded to the notices that there are so few opt-ins that AT&T can challenge on any ground. However, Plaintiffs' counsel would be remiss in their duty to represent all of the plaintiffs if 182 individuals were excluded simply because AT&T wants to mount challenges on any possible basis, including one whose impact on AT&T's exposure is, by any measure, negligible.

The opt-in procedure used in collective actions under the ADEA opt-in follows the opt-in procedure that is used in FLSA actions. Indeed, the ADEA adopts the FLSA's opt-in procedure by reference. ADEA §7(b), 29 U.S.C. § 626(b). Neither statute sets a deadline on opt-ins, nor provides rules on forms signed before but postmarked after a date set in the court-approved notice, or on forms postmarked before that date but inadvertently not signed.[9]

Although there are no statutory provisions or regulations, there is a

_____

[9] In this case, the names and addresses of the persons who sent in unsigned form are known because they were preprinted on each form.

reasonably substantial body of case law on this issue, including in the Third Circuit. *In re Cendant Corp. Prides Litigation*, 233 F.3d 188, 195 (3d Cir. 2000), affirmed the District Court's conclusions that a "good cause" standard applies to "requests to extend deadlines for filing proofs of claim," and that an "excusable neglect" standard applies to late-filed claims. *Accord Dasilva v. Esmor Correctional Servs., Inc.*, 167 Fed. Appx. 303, 2006 WL 197610, *2-3 (3d Cir. 2006) ("courts typically analyze late claims in class actions under the rubric of ... excusable neglect"; courts have duty to "manage the litigation ... to promote judicial economy and fairness"); *Kelley v. Alamo*, 964 F.2d 747, 750 (8th Cir. 1992) (a "generous reading, in favor of those whom Congress intended to benefit from the law, is also appropriate when considering issues of time limits and deadlines").

A number of factors have been considered under the "excusable neglect" standard. In *In re Cendant Corp. Prides Litigation*, 189 F.R.D. 321, 323 (D.N.J. 1999), the Court found that valid considerations include "the length of the delay and its potential impact on [the] judicial proceedings," "the danger of prejudice to the defendants, and "whether an asserted inadvertence [to timely participate] reflects an easily manufactured excuse." Accord *Ruggles v. Wellpoint, Inc.*, 2009 U.S. Dist. LEXIS 99548, *17-18 (N.D.N.Y. Oct. 4, 2009) (identifying five factors:

(1) good cause for the late submission, (2) prejudice to the defendant, (3) how long after the deadline passed the consent forms were filed, (4) judicial economy, and (5) the remedial purposes of the statute; adding 10 plaintiffs who failed to submit forms prior to the cut-off date to 300 person collective action, even though no good cause shown, because all of the other factors weighed in favor); *Robinson-Smith v. Gov't Employees Ins. Co.*, 424 F.Supp.2d 117, 123-24 (D.D.C. 2006) (weighing the purposes of the FLSA against the potential prejudice to the defendant); *Monroe v. United Air Lines, Inc.*, 94 F.R.D. 304, 305 (N.D. Ill. 1982) (permitting untimely opt-ins who had "reasonable excuses" considering how long after the deadline consents were filed and no "real prospect of prejudice" to defendants).

Other factors district courts have considered include: (1) how clear the notice was about the consequences of the prescribed date, (2) "inefficiencies" in the processing and postmarking of mail, and (3) the authority to "add" parties under FRCP 21 or consolidate actions under FRCP 42(a) if excluded individuals file another lawsuit. See *Camp v. Progressive Corp.*, 2003 U.S. Dist. LEXIS 14094, *5 (E.D. La. Aug. 5, 2003) (allowing 48 late opt-ins where notice was ambiguous about whether forms must be placed in the mail in time to be received by the date or simply be placed in the mail, recognizing delays in U.S. Mail,

including in postmarking envelopes); *Moya v. Pilgrim's Pride Corp.*, 2006 U.S.

Dist. LEXIS 87150, *6-9 (E.D. Pa. Nov. 30, 2006) (using good cause standard

where notice "fell[] prey to [the inefficiencies of] the [U.S.] Post [Office]");

*Mascol v. E&L Transp., Inc.*, 2005 U.S. Dist. LEXIS 32634, *29 (E.D.N.Y. June

30, 2005) (allowing untimely opt-in because district court has power under FRCP

21 to add parties on motion or its own initiative on such terms as are just);

*Abubakar v. County of Solano*, 2008 U.S. Dist. LEXIS 17456, 2008 WL 550117,

*2 (E.D. Cal. Feb. 22, 2008) (allowing late opt ins where consolidation under

FRCP 42(a) was foreseeable).

Significantly, AT&T does not cite the Third Circuit precedent on the

"excusable neglect" standard for untimely or incomplete opt-in forms. [10] AT&T

---

[10]   AT&T cites *Moya*, supra, *Camesi v. Univ. of Pittsburgh Med. Ctr.*, 2009 WL
4573287 *4, 11 (W.D. Pa. Dec. 1, 2009), and an unpublished Third Circuit
decision, *In re Diet Drug Prods. Liability Litig.*, 92 Fed.Appx. 890, 894-95 (3d
Cir. 2004).  *Camesi* held that a plaintiff's opt-in form was untimely under both the
excusable neglect and good cause standards where she "affirmatively chose" not
to timely join "through advice of [non-class] counsel." 2009 WL 4573287 at *2.
In *In re Diet Drug Prods.*, plaintiff's opt-out form was untimely under the
excusable neglect standard when her counsel filed the wrong form.  92 Fed. Appx.
890 at 894.

AT&T cites three cases that it says require forms to be signed. However,
*Kuhn v. Philadelphia Elec. Co.*, 475 F.Supp. 324, 327 (E.D. Pa. 1979), only holds
that there is no requirement that "consents be notarized."  In *EEOC v. Renhill
Group, Inc.*, 2009 WL 1605159, *3 (N.D. Ind. June 5, 2009), the class member
signed the form but "did not provide the proper witness signature", which was

also does not review any individual faults in the opt-ins, other than to provide the number in each of its subgroups and ask the Court to accept its challenges. Br. at 36-39. Most critically, AT&T neglects to mention that 146 of the 182 opt-ins that it is challenging were signed on or before the deadline and postmarked within one to five days after that date. Contrary to AT&T's motion, the notice, opt-in form and reminder were unclear as to whether the envelopes needed to be postmarked by November 26, 2007. Pls. Addit. Facts ¶ 60. Finally, AT&T makes no claim that there is a danger of prejudice to it if the opt-in plaintiffs it challenges continue to be in the collective action. Review of the opt-ins that AT&T challenges shows opt-ins that AT&T would exclude on the thinnest grounds, including ones signed November 26, 2007 and postmarked the next day, and an opt-in form signed by the <u>spouse</u> of a class member.[11] These opt-ins could not possibly be prejudicial to AT&T, given that dispositive motions are being filed only now, more than two

---

separately required by the claim form. *Perry v. Beneficial Fin. Co.*, 88 F.R.D. 221, 223 (W.D.N.Y. 1980), involved requests to be <u>excluded</u> from the class by representatives of deceased class members. The court found the requests invalid where the representatives did not clarify the "legal capacity" in which the request was made or where the papers "did not expressly request exclusion." *Id*. at 223.

[11] Spouses have a clear and legally-recognized interest in pension benefits because ERISA §205, 29 U.S.C. 1055, requires benefits to be offered in a form that provides an annuity for the spouse unless the spouse consents in writing to forego that right.

years later, and this case has not been scheduled for trial.

Judicial economy counsels, moreover, that for individual challenges like this, which involve only a very small portion of the class, the appropriate time for the Court to apply the "excusable neglect" standard is after trial and after notice to the potentially affected persons. If notified of AT&T's challenges, many of these individuals would provide a statement or other evidence of the reason why an opt-in was post-marked one day after the date in the notice or why an opt-in was unsigned or signed by a spouse. AT&T's proposal to simply exclude these persons categorically as plaintiffs without any review or reference to "excusable neglect" and with no notice to them not only is unfair, but it raises due process concerns.

**Conclusion**

For the foregoing reasons, Plaintiffs respectfully request that this Court deny AT&T's motion for partial exclusions or partial decertification.

Dated: March 5, 2010

                                        Respectfully submitted,

                                        s/ Stephen R. Bruce
                                        Stephen R. Bruce
                                        Allison C. Pienta
                                        805 15th St., NW, Suite 210
                                        Washington, DC 20005
                                        (202) 371-8013

31

<u>s/ Maureen S. Binetti</u>
Maureen S. Binetti
Wilentz, Goldman & Spitzer
90 Woodbridge Center Dr.
Woodbridge, NJ 07095-0958
(732) 855-6034

Jonathan I. Nirenberg
Resnick Nirenberg & Cash
101 Eisenhower Pkwy, Ste. 300
Roseland, NJ 07068
(973) 795-1240

Edgar Pauk
27 Eighth Ave.
Brooklyn, NY 11217
(347) 529-4604

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I, Maureen S. Binetti, hereby certify that on this 5th day of March 2010, I

caused the following documents to be served electronically upon the attorneys for

the Defendants who are listed below: (1) Plaintiffs' Opposition to AT&T's Motion

for Partial Summary Judgment or Decertification, (2) Plaintiffs' Responses to

Defendants' Rule 56.1 Statement in Support of Partial Summary

Judgment/Decertification and Plaintiffs' Statement of Additional Disputed and

Undisputed Material Facts, (3) the Certification of Stephen Bruce to Exhibits 76 to

108, and (4) this Certificate of Service.

| | |
|---|---|
| Anne E. Rea | Patricia S. Robinson |
| Jeffrey R. Tone | Christopher J. Mills |
| Linton J. Childs | David J. Treibman |
| Sidley Austin LLP | Fisher & Phillips, LLP |
| One South Dearborn | 430 Mountain Avenue |
| Chicago, IL 60603 | Murray Hill, NJ 07974 |
| area@sidley.com | probinson@laborlawyers.com |
| jtone@sidley.com | cmills@laborlawyers.com |
| lchilds@sidley.com | dtreibman@laborlawyers.com |

s/ Maureen S. Binetti
Maureen S. Binetti